THE STATE OF OHIO, APPELLEE, *v.* BROWN, APPELLANT.

[Cite as *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059.]

(No. 2001–0524—Submitted July 22, 2003—Decided October 8, 2003.)

FRANCIS E. SWEENEY, SR., J.

{¶ 1} On March 4, 1994, the Mahoning County Grand Jury indicted defendant-appellant, Mark A. Brown, for four counts of aggravated murder in the deaths of Isam Salman and Hayder Al Turk. Counts one and two alleged that appellant did purposely and with prior calculation and design cause the deaths of Salman and Al Turk. Each of these counts carried death penalty specifications alleging that the murders were committed as a course of conduct involving the purposeful killing or attempt to kill two or more persons and occurred while the offender was committing aggravated robbery. The counts also carried gun specifications. Counts 3 and 4 alleged that appellant committed aggravated murder while committing aggravated robbery, and contained the same death penalty and firearm specifications. Appellant was also indicted in count 5 for aggravated robbery and in count 6 for having a weapon under disability.

### Facts

{¶ 2} On the evening of January 28, 1994, appellant went with his friend, Allen Thomas, a.k.a. "Boonie," a juvenile, and Boonie's uncle, Gary Thomas, to a store to purchase beer and wine. Thomas then drove them to the home of Boonie's cousin, Kenny Dotson, to play cards. A group of juveniles was also at the house that evening. Appellant and Boonie drank wine mixed with a number of Valiums, and smoked marijuana in "blunts," which are cigars that have been cut open, emptied of tobacco, and filled with marijuana. Thomas stated that while playing cards, appellant pulled out a gun and put it back in his pants or coat pocket. Thomas further stated that appellant talked about the movie "Menace II Society" and said that he wanted to copy the scene in the movie where assailants robbed and killed two Oriental store clerks.

{¶ 3} Later that night, Thomas drove appellant and Boonie to the Midway Market in Youngstown to buy more drinks. Thomas parked the car while appellant and Boonie entered the store together. A group of minors who had been at Dotson's house earlier were standing just outside the store. Two of the minors, Marcus Clark and Myzelle Arrington, saw appellant and Boonie leave the store. They then saw appellant reenter the store alone, wearing a mask or bandanna around his neck. They said that Boonie and Thomas were in the car. They then heard gunshots and ran back to the Dotson home.

{¶ 4} Thomas verified the boys' account of what occurred, and added that before reentering the store, appellant said, "I forgot to do something." While

appellant was in the store, Thomas heard gunshots. Thomas saw appellant casually walk away from the store and get back into his car. When Thomas asked appellant what went on in the store, appellant replied, "Oh, that wasn't nothing but some firecrackers." Thomas drove appellant and Boonie back to the Dotson home, where he observed appellant "messing with the gun." Thomas also noticed that there was blood on appellant's hand and clothing. Both Clark and Arrington saw appellant either wiping off or loading a 9–mm black gun. Arrington saw him counting money.

{¶ 5} At approximately 9:55 that evening, Officer Timothy Morgan Jr. of the Youngstown Police Department received a call that a robbery was in progress at the Midway Market. He and his partner arrived on the scene and found two Arab males who had been shot and were apparently dead. One victim was found lying on the floor face up and the other was kneeling behind the register counter. A "blunt" and a packet of marijuana were on the floor nearby. The victims were later identified as storeowner Isam Salman and employee Hayder Al Turk. Dr. Anil Nalluri, Chief Deputy Coroner of Mahoning County, performed autopsies and determined that the victims died of hemorrhage and shock as a result of gunshot wounds to the head.

{¶ 6} Lieutenant David McKnight interviewed several witnesses and, on January 31, 1994, secured a warrant for appellant's arrest. On February 3, 1994, appellant was arrested in Warren and transported back to Youngstown. After advising him of his *Miranda* rights, which he waived in writing, police began questioning him. During the questioning, appellant admitted being at the Midway Market but claimed that Boonie was the shooter. Although police knew that video cameras in the store were not operating during the murders, the lieutenant asked appellant whether he knew that there were video cameras in the store. Appellant said that he had not noticed. Police told him that there were two video cameras in the store. Appellant replied, "Well, I guess you know what happened there then." When the police answered, "yes," appellant stated, "Well, you've got me." He also said, "Then you know I did it." Appellant then admitted to shooting one of the victims, but stated that he did not recall shooting the second victim. Appellant claimed that he got the gun from Steven Dotson and had "just flipped out." Appellant expressed regret over what happened and explained, "It's the Valliums [sic]. They make you go off."

{¶ 7} When appellant was apprehended, police retrieved a 9–mm Glock semiautomatic firearm under the couch cushion in the front room. The firearm was later identified by Steve Jones, who said that Brown had robbed him of his car at gunpoint on December 15, 1993; Jones's Glock was in the car's trunk at the time. Michael Roberts, a forensic scientist in the BCI firearms department, examined the Glock firearm, nine cartridge casings recovered from the crime scene, and

four bullets retrieved from the victims. He concluded that all nine cartridges were fired from the Glock firearm. He further concluded that the bullets recovered from the victims indicated that they were fired from a Glock weapon; however, he could not confirm or eliminate the Glock retrieved from appellant as the weapon from which they were fired.

{¶ 8} At trial, appellant took the stand in his own defense. Appellant admitted shooting one of the victims but not the other. He testified that Boonie was with him at the time of the shooting, and that Boonie took the gun from him after the first victim was shot. He stated that he did not steal any money from the store. Although he told police that he got the gun from Steven Dotson, he testified that he actually got it from a different friend, Mike Austin. Appellant further testified that he was "messed up" when police interviewed him, and that he requested an attorney two or three times, but that this request was denied.

{¶ 9} The jury convicted appellant of two counts of aggravated murder committed with prior calculation and design. The jury also found him guilty of the firearm specifications attached to these counts and the death penalty specifications that the murders occurred in the course of killing two people, but acquitted him of the specifications that the murders were committed while committing aggravated robbery. The jury returned not guilty verdicts as to counts three, four, and five, which charged appellant with aggravated murder while committing aggravated robbery, and with the crime of aggravated robbery itself. The jury recommended that appellant receive the death penalty for the aggravated murder of Salman and life imprisonment for the aggravated murder of Al Turk. The trial court sentenced appellant to death and to life imprisonment with parole eligibility after 30 years, with the sentences to run consecutively, and to three years of actual incarceration on the firearm specification for each of the two counts, to be served consecutively.

{¶ 10} Appellant appeals from the judgment to this court as a matter of right.

{¶ 11} Appellant has raised 15 propositions of law. We have fully considered each argument advanced and have reviewed the record in its entirety. We have also independently weighed the aggravating circumstance against the mitigating factors and have reviewed the death penalty for appropriateness and proportionality pursuant to R.C. 2929.05(A). Upon review, and for the reasons that follow, we affirm appellant's convictions and sentence of death.

## Pretrial Issue—Voluntariness of Confession

{¶ 12} In proposition of law V, appellant argues that the confession he made to police on February 4, 1994, was involuntary and that the trial court erred in refusing to suppress the confession.

{¶ 13} In determining whether a pretrial statement is involuntary, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Under the totality of the circumstances, and for the reasons that follow, we conclude that appellant made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his confession to police was voluntarily made.

{¶ 14} Appellant first argues that he was intoxicated and under the influence of drugs when he made the statement; thus, he maintains that his signed waiver was invalid because he did not fully understand his rights. The testimony of the detectives who interviewed appellant contradicts this claim. Detective McKnight testified that appellant was cooperative and alert during the interview. He further testified that he did not smell alcohol and did not observe anything that would indicate that appellant was under the influence of drugs or alcohol. Furthermore, at the suppression hearing, Detective Gerald Maietta, who also interviewed appellant, testified that he exhibited no signs of being intoxicated or on drugs, but was "friendly, cognizant, appeared to understand what we were talking about." Neither officer remembered appellant's telling them that he was under the influence of drugs or alcohol.

{¶ 15} It is well established that at a suppression hearing, "the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583. The trial court was free to find the officers' testimony more credible than appellant's. We therefore defer to the trial court's ruling regarding the weight and credibility of witnesses. *State v. Moore* (1998), 81 Ohio St.3d 22, 31, 689 N.E.2d 1.

{¶ 16} Appellant also argues that because of his youth and lack of experience with the criminal justice system, he was incapable of making a voluntary statement. Appellant was 21 years old at the time of the offense, had finished tenth grade, and could read and write. He did not lack the intelligence to understand what was being asked of him. Cf. Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession (1981), 8 A.L.R.4th 16. Moreover, appellant had been charged with and convicted of two prior felonies, at which times he was advised of his *Miranda* rights and was represented by counsel. He cannot legitimately argue that he was unfamiliar with the criminal justice system.

{¶ 17} Appellant further asserts that he was coerced into signing the waiver and deceived into admitting to killing one of the victims. This argument lacks

merit. Appellant conceded at the suppression hearing that he was not mistreated or deprived of sleep or food during questioning. The interview itself lasted for one hour and ten minutes and thus was not unduly long. Although the police misled appellant into thinking that his crime had been caught on video cameras, this fact alone was insufficient to render his confession involuntary, and appellant claims no further coercion. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97.

{¶ 18} Appellant next argues that the trial court should have suppressed his confession because police ignored his request to have an attorney present. Under the Fifth Amendment, if an accused requests counsel during questioning, the interrogation must cease until an attorney is present. *Arizona v. Roberson* (1988), 486 U.S. 675, 677, 108 S.Ct. 2093, 100 L.Ed.2d 704; *Edwards v. Arizona* (1981), 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378. For the interrogation to cease, however, the accused must clearly invoke his constitutional right to counsel. *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. In order to do this, an accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. No cessation of questioning is required if the request is ambiguous.

{¶ 19} In this case, Detective McKnight testified that he had no recollection that appellant requested a lawyer. However, even if we assume the truth of appellant's testimony, we would still find that he did not clearly invoke his constitutional right to counsel. At the suppression hearing, appellant testified as follows: "Before he asked me to understand my rights, he asked me do I have any questions, and I asked him, don't I supposed to have a lawyer present; and neither one of them answered." This statement is at best ambiguous. It is similar to the statement made in *State v. Henness* (1997), 79 Ohio St.3d 53, 62, 679 N.E.2d 686, where the defendant stated, "I think I need a lawyer." In *Henness*, we held that this remark was not an unequivocal assertion of the right to counsel. Id. at 63, 679 N.E.2d 686. We likewise find that the alleged statement by appellant was not a clear invocation of his right to counsel.

{¶ 20} Based on the foregoing, we find that the trial court did not err in failing to suppress appellant's confession. We overrule proposition of law V.

### Trial Issues

#### *"Other Acts" Evidence*

{¶ 21} In proposition of law III, appellant argues that the trial court erred and denied him a fair trial by allowing the prosecution to introduce "other acts" testimony. In particular, appellant maintains that the trial court should not have allowed witness Steve Jones to testify that appellant robbed him of his Glock 9–

mm gun, which was later identified as the murder weapon. Appellant further argues that it was improper for his mother to testify that he was a member of a gang and belonged to the "Baby Crips" when he was a child living in California.

{¶ 22} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 23} With respect to Jones's testimony that appellant robbed him of his Glock 9–mm gun, the trial court instructed the jury that his testimony "may be considered for the purpose of determining the proof of the identity of the defendant. Said evidence may not be considered as proof that the defendant committed the robbery of Steve Jones or of the character of the defendant." At the close of the trial, the court reiterated to the jury that the evidence could be used to prove only the defendant's identity.

{¶ 24} Evid.R. 404(B) clearly allows "other acts" evidence as proof of identity. *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675. Jones's testimony was used as proof of identity in that it clearly helped link appellant to the gun found in his possession when he was arrested. Appellant asserts that identity was not at issue, since he had already admitted to killing one of the store clerks. Thus, appellant maintains that the "other acts" testimony was unnecessary to prove identity. This argument lacks merit. As stated in *State v. McNeill* (1998), 83 Ohio St.3d 438, 442, 700 N.E.2d 596, need is irrelevant in determining the validity of an Evid.R. 404(B) objection. Moreover, the trial court minimized the likelihood of undue prejudice by giving limiting instructions to the jury to alert them to the narrow purpose of admitting such evidence. We consequently find that the trial court did not abuse its discretion in admitting this "other acts" testimony.

{¶ 25} However, we find that the trial court should not have allowed appellant's mother to testify as to his participation in a gang. This testimony was irrelevant and portrayed appellant in a negative light. Nevertheless, given the substantial evidence of appellant's guilt, we find that this evidence, even though improperly admitted, did not affect the outcome of the case and therefore constitutes harmless error. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866. We overrule proposition of law III.

### Use of Prior Convictions

{¶ 26} In proposition of law IV, appellant argues that the trial court erred in allowing the state to use his prior drug-offense convictions for impeachment purposes. Appellant filed a motion in limine to prevent the admission of such evidence. The court initially granted his motion, but then upon reconsideration

modified its ruling to allow defendant to be questioned about his prior felony convictions punishable by imprisonment in excess of one year if he decided to take the witness stand. During direct examination, appellant testified that he had gone to jail for a previous drug conviction. On cross-examination, appellant admitted to two prior drug-offense convictions.

{¶ 27} Evid.R. 609(A)(2) permits the admission of prior convictions if the crime was punishable by imprisonment in excess of one year, provided that the probative value outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury, and the evidence is not excluded by the court in its discretion under Evid.R. 403(B). A trial court is afforded broad discretion in determining the extent to which such evidence may be admitted under Evid.R. 609. *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923, syllabus. The trial court did not abuse its discretion in allowing the state to use appellant's prior drug convictions to impeach his credibility. Appellant's testimony on direct examination opened the door to further questioning on cross-examination about his prior drug-offense convictions. Furthermore, since appellant's version of what occurred the night of the murders contradicted some of the other witnesses, his credibility was at issue. Under these circumstances, it was appropriate for the state to impeach appellant and to test his credibility by introducing testimony regarding these prior convictions. Furthermore, we find no undue delay or needless accumulation in permitting such evidence under Evid.R. 403(B). Consequently, we overrule proposition of law IV.

### Sentencing Issues

### Supplemental Jury Instruction: Deadlocked Jury

{¶ 28} In proposition of law I, appellant argues that the trial court erred in failing to give the correct supplemental instruction to the deadlocked jury in the penalty phase. Alternatively, appellant contends that the court should have declared a mistrial, discharged the jury, and sentenced him to life imprisonment.

{¶ 29} The jury underwent lengthy penalty deliberations and was, for a time, deadlocked. The jury began deliberating at 12:10 p.m. on February 22, 1996, and retired for the day at 6:35 p.m. The jury resumed deliberations the next day at 9:05 a.m. At 2:20 p.m., the jury informed the court that it had "come to an agreement on one recommendation. We cannot agree on the other; we're deadlocked * * *." At this point, the court issued a supplemental instruction, referred to as a *Howard* charge (slightly modified from the charge in *State v. Howard* [1989], 42 Ohio St.3d 18, 537 N.E.2d 188).[1] The instruction advised the jurors:

---

1. The *Howard* charge was modified by the judge so that the words "jurors for acquittal" were changed to "jurors for life." Also, the term "death" was substituted for "guilt."

{¶ 30} "It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with the disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for life should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest to have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for death should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors."

{¶ 31} Defense counsel objected to the *Howard* charge and requested that the court read a different supplemental instruction taken from *State v. Martens* (1993), 90 Ohio App.3d 338, 629 N.E.2d 462, which discussed the impossibility of reaching a verdict. The *Martens* charge, which is reflected in 4 Ohio Jury Instructions (2000), Section 415.50(4), instructs the jury: "If you decide that you cannot agree and that further deliberations will not serve a useful purpose you may ask to be returned to the courtroom and report that fact to the court. If there is a possibility of reaching a verdict you should continue your deliberations." Id. at 343, 629 N.E.2d 462. The court refused to give this instruction.

{¶ 32} Nearly four hours after the court read its *Howard* charge, defense counsel, arguing that the jury was irreconcilably deadlocked, moved for a mistrial under *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96. In *Springer*, we held that "[w]hen a jury becomes irreconcilably deadlocked during its sentencing deliberations in the penalty phase of a capital murder trial and is unable to reach a unanimous verdict * * *, the trial court is required to sentence the offender to life imprisonment." Id. at syllabus. The trial court overruled the motion for mistrial. The jury continued deliberating until 9:08 p.m. that day.

{¶ 33} The next day, February 24, 1996, the jury reconvened at 10:30 a.m. Defense counsel requested that the court either instruct the jury to "move on" and consider one of the life-sentence options or give the *Martens* charge. The court refused. About three hours later, with the jury still deliberating, defense counsel repeated the request. Again the court declined.

{¶ 34} At 4:35 p.m., between 12 and 13 hours after the court read its *Howard* charge, the jury announced its verdict. The jurors recommended that appellant receive the death sentence for the murder of Isam Salman and life imprisonment for the murder of Hayder Al Turk with parole eligibility after 30 years. When the jury was polled, Juror York stated, "Your Honor, I compromise with the other eleven jurors [sic]."

{¶ 35} The court then asked her, "Are these your verdicts?" Juror York answered, "No, they're not." The court repeated, "These are not your verdicts?" She answered, "I compromised, Your Honor, with the other jurors."

{¶ 36} The court then sent the jurors back into the jury room. Defense counsel moved for a mistrial or, in the alternative, for a *Martens* charge. The judge declined, but decided to reread the penalty instructions in their entirety to the jury, but without the *Howard* charge. Approximately two and one-half hours later, the jurors reached a unanimous verdict and, when polled, all jurors, including York, stated without reservation that it was their verdict.

{¶ 37} In this proposition of law, we are asked to decide whether the trial court abused its discretion in giving the *Howard* charge rather than the *Martens* charge, and erred in failing to remove the case from the jury and sentencing Brown to life imprisonment. Whether the jury is irreconcilably deadlocked is essentially "a necessarily discretionary determination" for the trial court to make. *Arizona v. Washington* (1978), 434 U.S. 497, 510, 98 S.Ct. 824, 54 L.Ed.2d 717, fn. 28. In making such a determination, the court must evaluate each case based on its own particular circumstances. *State v. Mason* (1998), 82 Ohio St.3d 144, 167, 694 N.E.2d 932. There is no bright-line test to determine what constitutes an irreconcilably deadlocked jury. In fact, we have stated that "[n]o exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury, as done in *Springer*." *Mason* at 167, 694 N.E.2d 932.

{¶ 38} In this case, although the jury deliberated for many hours, we are unwilling to find that the trial court abused its discretion in finding that the jury was not irreconcilably deadlocked and in choosing to issue a *Howard* rather than a *Martens* charge. We have twice upheld the use of a *Howard* charge, specifically finding that such an instruction is not coercive, and, in fact, is "intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus." *State v. Robb* (2000), 88 Ohio St.3d 59, 81, 723 N.E.2d 1019; see, also, *Mason*, 82 Ohio St.3d at 167, 694 N.E.2d 932. In this case, even though the jurors deliberated for a lengthy period of time, they never advised the court, after their initial deadlock, that they were unable to reach a verdict. Thus, the court acted within its discretion in refusing to give the *Martens* instruction regarding the impossibility of reaching a verdict. Even the *Martens* court itself, in refusing to require the instruction in that case, acknowledged that such an instruction should not be given prematurely. Otherwise, "the instruction may be contrary to the goal of the *Howard* charge of encouraging a verdict where one can conscientiously be reached." *Martens*, 90 Ohio App.3d at 343, 629 N.E.2d 462.

{¶ 39} As to the trial court's refusal to declare a mistrial under *Springer*, again, we find no abuse of discretion. In *Springer*, it was evident that the jury was irreconcilably deadlocked on sentencing. On the second day of deliberations, the jury informed the judge that it was "stalemated." Id. at 168, 586 N.E.2d 96. The court then gave the jury a supplemental charge similar to the *Howard* charge. Deliberations continued into the third day. The jurors queried the judge several more times, again indicating that they were still struggling against a stalemate. The jury informed the court on the third day of deliberations that it was hopelessly deadlocked and could not recommend any sentence, and they were discharged. In contrast, after hearing the *Howard* charge, the jury in this case, unlike the jury in *Springer*, made no further inquiries to the court. It never informed the court that they continued to be deadlocked. Instead, even after the polling of the jury, the jurors continued their deliberations without hesitation. The trial court was justified in refusing to give the *Martens* charge, since there was no clear indication that the jurors would be unable to reach a verdict. For these reasons, we overrule proposition of law I.

### Allegedly Compromised Jury Verdict

{¶ 40} In proposition of law II, appellant argues that the trial court should have declared a mistrial when juror York stated that her verdict had been compromised. At the least, appellant contends that the court should have questioned the juror further after hearing that her verdict was compromised. See *State v. Brumback* (1996), 109 Ohio App.3d 65, 73–74, 671 N.E.2d 1064.

{¶ 41} R.C. 2945.77 and Crim.R. 31(D) provide for the polling of the jury to determine whether there is a unanimous verdict. In particular, R.C. 2945.77 provides: "If one of the jurors upon being polled declares that said verdict is not his verdict, the jury must further deliberate upon the case." Crim.R. 31(D) states, "If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged."

{¶ 42} The determination of whether to grant a mistrial is within the sound discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900. In deciding whether there has been an abuse of discretion, we are cognizant of the fact that the trial judge remains in the best position to view the demeanor and actions of the juror to determine whether further questioning is necessary. Id. at 20, 517 N.E.2d 900. We will not second-guess that determination absent an abuse of discretion. See *State v. Williams* (1995), 73 Ohio St.3d 153, 167, 652 N.E.2d 721.

{¶ 43} Although the better practice would be for the trial judge to conduct further inquiry of a dissenting juror, see, e.g., *State v. Hessler* (2000), 90 Ohio St.3d 108, 115–122, 734 N.E.2d 1237, neither the Criminal Rules nor the statute mandates further questioning. Nor does the fact that Juror York expressed

reservation necessitate the granting of a mistrial or reversal of the verdict. The *Hessler* decision exemplifies this point. In *Hessler*, after signing the penalty form, a juror was visibly upset, crying in the hallway and refusing to go into the courtroom. The trial judge questioned the juror in his chambers and informed her that she was free to change her mind if she felt that her vote had been coerced. Following the inquiry, when polled, the juror stated that she agreed with the recommendations. In finding no error in the judge's approach, we noted that the juror was given the chance to change her mind, but when she was individually polled, she stated that she agreed with the recommendation. Under those circumstances, we held that the trial court did not abuse its discretion in proceeding as it did. Id., 90 Ohio St.3d at 115–121, 734 N.E.2d 1237.

{¶ 44} Even though the trial court in this case did not question Juror York further, we do not find that the trial court abused its discretion. Unlike the distraught juror in *Hessler*, York willingly went back into deliberations and did not express any further concern. Had she expressed further reservation about her verdict or about further deliberating, then it may have been necessary to conduct an inquiry. However, in this case, when the final verdict was read, Juror York unequivocally answered that she agreed with the verdict.

{¶ 45} Certainly, a jury's attempt to reach a unanimous verdict is a difficult and emotional undertaking. This is inherent in the structure of the jury system itself, since "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States* (1896), 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528. As we stated in *Hessler*, 90 Ohio St.3d at 120, 734 N.E.2d 1237, "The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent."

{¶ 46} Under the circumstances presented, we do not find that the trial court abused its discretion in the handling of Juror York. Consequently, we overrule proposition of law II.

### Readmission of Trial Exhibits

{¶ 47} In proposition of law VI, appellant contends that the trial court erred in readmitting trial exhibits during the mitigation phase. We have previously held that the trial court may properly allow reintroduction of exhibits from the trial phase into the mitigation phase pursuant to R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus; *State v. Myers*, 97 Ohio St.3d 335, 358–359, 780 N.E.2d 186, ¶ 138–139. We overrule proposition of law VI.

## Cumulative Error

{¶ 48} In proposition of law VII, appellant contends that he was denied a fair trial due to the cumulative effect of errors by the trial court. Although we recognize the doctrine of cumulative error, *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus, the doctrine is not applicable to the instant case, since any error we have found was either harmless or curable by our independent review. See *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. We overrule this proposition of law.

## Settled Issues

{¶ 49} Appellant raises several issues that we have previously resolved and require no further discussion. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Accordingly, we summarily overrule propositions of law IX and XI, which challenge the constitutionality of our proportionality review. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. We also overrule propositions of law X, XII, XIII, XIV, and XV, which challenge the constitutionality of Ohio's death penalty scheme on various grounds. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Mapes* (1985), 19 Ohio St.3d 108, 116–117, 19 OBR 318, 484 N.E.2d 140; *State v. Maurer* (1984), 15 Ohio St.3d 239, 241–242, 15 OBR 379, 473 N.E.2d 768; *State v. Zuern* (1987), 32 Ohio St.3d 56, 64–66, 512 N.E.2d 585; *State v. Carter* (2000), 89 Ohio St.3d 593, 607–608, 734 N.E.2d 345. We further reject proposition of law VIII, where appellant argues that he was denied due process because the jury was not required to articulate the methods and reasoning by which it determined that the aggravating circumstance outweighed the mitigating factors, since we have consistently rejected similar arguments. See *Jenkins,* 15 Ohio St.3d at 176–177, 15 OBR 311, 473 N.E.2d 264; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 318, 652 N.E.2d 988.

## Independent Review and Proportionality

{¶ 50} Appellant called four mitigation witnesses. His mother, Betty Brown, testified about raising appellant in an unstable environment, where she openly drank alcohol, used drugs, and frequently left appellant and his two older siblings alone. On one occasion during his childhood, when left alone, appellant started a fire in their apartment when cooking. Betty also admitted that during the first trimester of her pregnancy with appellant, she used heroin, and also smoked marijuana on a daily basis. Betty never married appellant's father.

{¶ 51} Betty testified that she moved her children from place to place and often left them in the care of others. At times, appellant lived with either an aunt or uncle in Youngstown. For a time, he lived with his mother in Los Angeles but

then returned without her twice to live again with a relative in Youngstown. Betty lost contact with her son and rarely saw him after he was twelve years old.

{¶ 52} Stephanie Johnson also testified on appellant's behalf. She stated that appellant's sister, Michelle, lived with her in Pittsburgh from time to time. She further stated that Betty Brown often grossly neglected her children and was a heavy drug user. She described appellant as quiet and slightly withdrawn.

{¶ 53} Robert L. Smith, a clinical psychologist, testified that he interviewed appellant twice for a total of nine hours. He testified that appellant had suffered a series of losses in his life, including the abandonment of his father and recurrent abandonments by his mother. Appellant grew up in an unstable environment, surrounded by drug and alcohol abuse, with little nurturing. He began using alcohol and marijuana when he was ten or eleven years old. By late adolescence, appellant was addicted to alcohol, marijuana, and sedatives. He was also sexually abused when he was six and then became very sexually active around age fifteen.

{¶ 54} Smith administered several tests on appellant, including the Minnesota Multiphasic Personality Inventory II, the Substance Abuse Subtle Screening Inventory, the Michigan Alcoholism Screening Test, and the Drug Abuse Screening Test. Smith diagnosed appellant as suffering from substance dependence and a borderline personality disorder. Smith found that appellant suffered from an identity disturbance and effective instability, which is characterized by chronic feelings of emptiness and difficulty controlling anger, coping with life, and trusting others. Smith testified that appellant had difficulty controlling his impulses, which were intensified by his drug and alcohol abuse.

{¶ 55} Appellant made an unsworn statement in which he expressed deep remorse for his actions. He asked the victims' families for forgiveness and asked God for forgiveness as well.

{¶ 56} After independent assessment, we conclude that the evidence proves beyond a reasonable doubt the aggravating circumstance in this case, that appellant murdered Isam Salman as part of a course of conduct as defined in R.C. 2929.04(A)(5).

{¶ 57} We find nothing in the nature and circumstances of the offense to be mitigating. The evidence shows that appellant reentered the store with a gun, wearing a bandanna or mask around his face. After he allegedly "had words" with Al Turk, appellant then repeatedly shot Al Turk and Salman. He casually walked back to the car and said that the gunshots were simply the sound of firecrackers. Appellant's actions lack any mitigating features.

{¶ 58} Appellant's history, character, and background provide some mitigation. He grew up in an unstable home environment. He moved around a great deal and was frequently left to live with persons other than his mother or, when he

was with his mother, was expected to care for himself. Appellant was also surrounded by drug and alcohol abuse, and was sexually abused at an early age.

{¶ 59} We find that the mitigating factors of R.C. 2929.04(B) are either inapplicable or are entitled to little weight. Under R.C. 2929.04(B)(1), there was no evidence that the victims induced or facilitated the murders. Nor was there sufficient evidence of duress, coercion, or strong provocation as set forth in R.C. 2929.04(B)(2). In fact, appellant himself testified that he simply "flipped out" when he committed the murders. Although he suffers from substance dependence and a borderline personality disorder, appellant does not suffer from a mental disease or defect that caused him to lack substantial capacity to appreciate the criminality of his conduct or conform his conduct to the law. R.C. 2929.04(B)(3). The fact that appellant was 21 at the time of the murders is entitled to only slight mitigating weight under R.C. 2929.04(B)(4) (youth of the offender). See, e.g., *State v. Madrigal* (2000), 87 Ohio St.3d 378, 400, 721 N.E.2d 52. R.C. 2929.04(B)(5) and (6) are inapplicable, since appellant had a history of two prior felony drug convictions and because he was the sole offender in the murders. The catchall factor of R.C. 2929.04(B)(7) is applicable. Appellant's poor upbringing, substance-abuse problems, and personality disorder merit some weight in mitigation, as does the fact that he expressed remorse for his actions. *State v. Johnson* (2000), 88 Ohio St.3d 95, 123, 723 N.E.2d 1054; *State v. Mitts* (1998), 81 Ohio St.3d 223, 236–237, 690 N.E.2d 522. Appellant's voluntary intoxication is entitled to little mitigating weight. Id. at 237, 690 N.E.2d 522.

{¶ 60} In weighing the mitigating factors against the aggravating circumstance, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The evidence showed that appellant went back into the store armed with a gun and with a bandanna or mask covering his face. He then shot and killed the two victims as part of a course of conduct and initially tried to conceal the fact that he was the triggerman. Appellant's actions merit the capital penalty to which he was sentenced.

{¶ 61} We further conclude that the death penalty imposed for each aggravated murder is appropriate and proportionate when compared to similar capital crimes involving the purposeful killing or attempt to kill two or more persons. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72; *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304.

{¶ 62} For the foregoing reasons, we affirm appellant's convictions and death sentence.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

Paul J. Gains, Mahoning County Prosecuting Attorney, and Janice T. O'Halloran, Assistant Prosecuting Attorney, for appellee.

Mary Jane Stephens and John B. Juhasz, for appellant.