JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Ricky Townsend appeals from his conviction for rape and kidnapping. For the reasons set forth below, we affirm.
 {¶ 2} On February 4, 2005, defendant was indicted for three counts of rape and two counts of kidnapping, with sexual motivation specifications, all in connection with the 1997 attack on a then thirteen year-old girl. Defendant pled not guilty and the matter proceeded to a jury trial on August 25, 2005.
 {¶ 3} The state presented the testimony of the girl ("P.S."), her mother, nurse Loretta Gudenas, Euclid Police Officer Daniel Royko, Dr. Coverdale, Christine Schneider, Heather Bizup, Robert Sharp, and Marianne Beni.
 {¶ 4} The girl testified that on November 27, 2005, her mother asked her to clean her room. She did not want to and left the house. The girl went to Popeye's to use the payphone to call her grandmother. There was no answer and, as she was returning home, she was hit in the head and was in a daze. She next realized that her eyes were blindfolded and that she was inside a van. One person held her hands while another person penetrated her vaginally. After that assault ended, she felt a second penetration and later, a third. The girl believed that she had been raped by three separate assailants. They then pushed her out of the van near the place from which they had taken her.
 {¶ 5} The girl further testified that she was a virgin at the time of the incident and that she does not know defendant and was never in a relationship with him.
 {¶ 6} The girl's mother testified that at approximately 9:30 p.m. on November 27, 1997, she asked P.S. to end a telephone conversation and go to bed. The girl then left the home. The girl's mother went outside to look for the girl but could not find her and went looking for her.
 {¶ 7} At 5:00 a.m., the girl returned. She was hysterical and crying and remained upset during the following week. The girl's mother took her to the hospital and a rape kit was completed. She also took the girl to counseling sessions at the Rape Crisis Center and later arranged for her to enter the ProKids program conducted by the juvenile court.
 {¶ 8} Loretta Gudenas testified that in 1997, she was working as a nurse in the Emergency Room of Euclid Hospital. Gudenas examined the girl, following the rape protocol, and prepared a narrative which relayed the girl's description of the attack.
 {¶ 9} Officer Royko testified that the rape kit and the girl's clothing was locked in the property room at the police station since November 1997.
 {¶ 10} Dr. Coverdale testified that he examined the girl at the emergency room and detected motile sperm. The girl's hymen was torn and bleeding.
 {¶ 11} C.S. testified that she is the girl's sister. Following the attack, the girl was crying uncontrollably and stopped going to school. Christine eventually took legal custody of her.
 {¶ 12} Heather Bizub, a DNA analyst for the Bureau of Criminal Identification, testified that the lab tests thirteen points in a section of DNA to determine whether an individual can be excluded as having contributed to a particular sample. In this matter, the evidence obtained from the rape kit indicated that semen, and thus DNA, was present in the vaginal swabs. It was not a mixed sample, meaning that there was a single source for the stain. Defendant could not be excluded as the source of the semen and the profile obtained could be found in one out of seven quintillion individuals.
 {¶ 13} Marianne Beni, an emergency room nurse at Euclid Hospital, testified that the rape kit was sealed and the police picked it up.
 {¶ 14} Robert Sharp testified that he shared a jail cell with defendant and contacted police following several discussions with defendant. Sharp testified that he has not been promised anything in exchange for his cooperation in this case. According to Sharp, defendant stated that he had sex with her a few times and she started to bleed.
 {¶ 15} He admitted that he was serving time for trafficking in counterfeit controlled substances. He had also been arrested for aggravated burglary and aggravated breaking and entering. He stated that he got no legal benefit from his testimony.
 {¶ 16} Det. Patrick Gallagher testified that he obtained an investigative lead based on the DNA and had the girl come in to make a statement. Det. Gallagher also took a statement from defendant and he indicated that he did not know the girl and and had no explanation as to why his DNA was found inside her. He stated that he never had non-consensual sex with anyone, and that in 1997, had sex with a girl who had a two-year-old child.
 {¶ 17} He acknowledged that in the girl's 1997 narrative to police, she indicated that she had left the home at 12:30 a.m. and not 9:30 p.m., as she had stated. In addition, in the 1997 narrative, she heard no voices during the ordeal and that she did not know if she was penetrated more than once. He also acknowledged that the hospital records did not indicate that there were multiple attackers.
 {¶ 18} Defendant elected to present evidence and offered the testimony of his sister, Myesha Townsend, and his grandmother, Bennie Jean Thomas.
 {¶ 19} Myesha Townsend testified that she and the girl both attended Margaret Spellacy Elementary School together and were friends. The girl came to her home and spent time with defendant. According to the witness, the girl was in love with defendant and wanted to lose her virginity to him. She testified that in 1999 she witnessed them coming out of her grandmother's garage. Townsend tried to explain the relationship to Det. Gallagher but he instructed her to tell defendant's attorney.
 {¶ 20} Bennie Jean Thomas, defendant's grandmother, testified that Myesha had a friend named Pam who spent time with defendant.
 {¶ 21} The state subsequently presented Det. Gallagher again, on rebuttal, who testified that no one from defendant's family ever called him to inform him that defendant and the girl had a relationship. He also admitted, however, that no one from the girl's family had called him.
 {¶ 22} Defendant was subsequently convicted of all charges and was sentenced to a total of thirty-six years of imprisonment. He now appeals and assigns three errors for our review.
 {¶ 23} Defendant's first assignment of error states:
 {¶ 24} "Did the trial court err by the type of charge it gave when it learned the jury was deadlocked in its deliberations."
 {¶ 25} Within this assignment of error, defendant raises three complaints. First, he asserts that the Howard charge should not have been given since the jury had only been deliberating from the afternoon of September 1, 2005 to the afternoon of September 2, 2005. Second, he claims that the charge was coercive of a verdict. Third, he complains that the trial court should have instead given the "verdict impossible" instruction. We review for plain error since no objection was raised. Crim.R. 52.
 {¶ 26} 1. Howard Charge versus Martens Charge
 {¶ 27} In State v. Howard (1989), 42 Ohio St.3d 18,537 N.E.2d 188, the Ohio Supreme Court approved a supplemental charge to be given to juries deadlocked on the question of conviction or acquittal. The charge must be balanced and neutral, and comport with the following goals: (1) encourage a unanimous verdict only when one can conscientiously be reached, leaving open the possibility of a hung jury and resulting mistrial; and (2) call for all jurors to reevaluate their opinions, not just the jurors in the minority. Id.
 {¶ 28} In State v. Martens (1993), 90 Ohio App.3d 338,629 N.E.2d 462, the court considered an instruction for the issue of impossibility of reaching a verdict, set forth in 4 Ohio Jury Instructions (2000), Section 415.50(4). The court stated:
 {¶ 29} "This instruction is appropriately given when it appears to the court that the jury, after deliberating for a reasonable period of time, is unable to reach a verdict. The instruction changes the focus of deliberations by asking the jury to decide whether any verdict can be reached through further deliberations. If given prematurely, the instruction may be contrary to the goal of the Howard charge of encouraging a verdict where one can conscientiously be reached."
 {¶ 30} Moreover, whether a jury is irreconcilably deadlocked is essentially a discretionary determination for the trial court to make. State v. Brown, 100 Ohio St.3d 51, 2003-Ohio-5059,796 N.E.2d 506. There is no bright-line test to determine what constitutes an irreconcilably deadlocked jury. Id.
 {¶ 31} In this matter, the record indicates as follows:
 {¶ 32} "Ladies and gentlemen, I have been in receipt of your statement that you are deadlocked at this point. I'm going to read some further instructions for you that might help you." (Tr. 849)
 {¶ 33} On this record, we cannot say that the trial court abused its discretion in determining that there was a deadlock as opposed to an irreconcilably deadlocked jury. The "verdict impossible" instruction was not requested, and, in any event, the trial court would have defeated the goal of encouraging a verdict where one can conscientiously be reached, if had given the "verdict impossible" charge at that point in the proceedings. SeeState v. Washington (1998) 126 Ohio App.3d 264, 280-81,710 N.E.2d 307. If they remained deadlocked following the Howard
charge, the verdict impossible charge may have been appropriate. Id.
 {¶ 34} This portion of the assignment of error lacks merit.
 {¶ 35} 2. The Charge
 {¶ 36} In this matter, the Court instructed the jury as follows:
 {¶ 37} "The completion of this trial is of great importance to the parties and to the Court. Not only has there been considerable expense to bring this matter to trial, but also expenditure of valuable time of the parties, the Court, the attorneys, and, of course your valuable time.
 {¶ 38} "I urge you to exert every possible effort to reach an agreement if you can conscientiously do so.
 {¶ 39} "This is a new and difficult assignment for you. The process of discussion and deliberation in the jury room is necessarily slow and requires careful consideration and patience.
 {¶ 40} "I request that you return to the jury room and review the opinions of each juror to determine whether you have overlooked areas of agreement which could lead to a verdict.
 {¶ 41} "In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere consent to the conclusion of the other jurors, each question submitted to you should be examined with proper regard and deference to the opinions of other jurors.
 {¶ 42} "You should consider desirable that the case be decided. You are selected in the same manner, from the same source, as any future jury would be.
 {¶ 43} "There is no reason to believe the case will ever be submitted to a jury more capable, impartial or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side.
 {¶ 44} "It is your duty to decide the case, if you can honestly do so. You should listen to each argument with the disposition to be persuaded. Do not hesitate to re-examine your views and change your position if you are convinced it is wrong. As there is disagreement, all jurors should re-examine their position, given that a verdict has not been reached.
 {¶ 45} "Jurors more in favor of the State of Ohio should consider whether their position is correct, considering it is not shared by others equally honest who have heard the same evidence with the same desire to arrive at the truth and under the same oath.
 {¶ 46} "Likewise, jurors more in favor of the defendant should ask themselves whether their position is correct, considering that it is not shared by other jurors.
 {¶ 47} "Ladies and gentlemen, I'm going to ask you to return to your jury room and continue your deliberations." (Tr. 849-852).
 {¶ 48} We note that the first four paragraphs of the court's charge were approved in State v. Stidham, Knox App. No. 03CA000022, 2004-Ohio-4206; State v. Brown (March 31, 2000), Trumbull App. Nos. 95-T-5349 and 98-T-0061.
 {¶ 49} We note that the remainder of the trial court's charge tracks the supplemental charge adopted in State v. Howard,
supra, paragraph two of the syllabus.
 {¶ 50} In accordance with the foregoing, we do not find the instruction to be coercive of a verdict or otherwise erroneous.
 {¶ 51} This assignment of error is without merit.
 {¶ 52} Defendant's second assignment of error states:
 {¶ 53} "Did the court err in allowing the state to reexamine its own witness based on an allegedly prior inconsistent statement."
 {¶ 54} Within this assignment of error, defendant complains that the trial court erred by permitting the state to examine Sharp on redirect on the basis of his written statement to police.
 {¶ 55} Evid.R. 801 provides in relevant part:
 {¶ 56} "(D) Statements which are not hearsay. A statement is not hearsay if:
 {¶ 57} "(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or or implied charge against him of recent fabrication or improper influence or motive."
 {¶ 58} Accord State v. Bock (1984), 16 Ohio App.3d 146,474 N.E.2d 1228.
 {¶ 59} In this matter, defendant's trial attorney repeatedly cross-examined Sharp as to what the state had offered him in exchange for his testimony and therefore raised an implied charge of improper motive. In addition, counsel accused the witness of taking "snippets or small portions of what someone says and mould[ing] it to what suits your purpose."
 {¶ 60} Accordingly, the state was permitted to offer Sharp's prior statement under Evid.R. 801(D)(1)(b).
 {¶ 61} This assignment of error is without merit.
 {¶ 62} Defendant's third assignment of error states:
 {¶ 63} "Did the trial court err in overruling defense counsel's motion for a mistrial when Mr. Sharp mentioned defendant's prior criminal activity."
 {¶ 64} As an initial matter we note that reference to the Combined DNA Index System CODIS in and of itself has been permitted. State v. Allen, Hamilton App. Nos. C-050010, C-050011, 2006-Ohio-2338; State v. Simon, Franklin App. No. 05AP-898, 2006-Ohio-2741; State v. Smith, Montgomery App. No. 21058, 2006-Ohio-2365.
 {¶ 65} We further note that the grant or denial of an order of mistrial lies within the sound discretion of the trial court,State v. Glover (1988), 35 Ohio St.3d 18, 517 N.E.2d 900;State v. Widner (1981), 68 Ohio St.2d 188, 429 N.E.2d 1065, when the ends of justice so require and a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127,580 N.E.2d 1, 9.
 {¶ 66} In addition, a jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. See State v. Loza (1994), 71 Ohio St.3d 61, 75,641 N.E.2d 1082, 1100, quoting State v. Henderson (1988),39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246. Accord State v.Garner, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623
(trial court did not err in failing to order a mistrial where reference to defendant's prior arrests was fleeting and was promptly followed by a curative instruction); State v. Jones
(1996), 115 Ohio App.3d 204, 207, 684 N.E.2d 1304 (the court did not err in denying a mistrial based on testimony about a prior record as jury was presumed to have followed the curative instruction).
 {¶ 67} In this matter, the state and counsel for defendant stipulated that they would not refer to defendant's prior incarceration or the fact that the CODIS database includes prisoner information. (Tr. 10). Thereafter, defense counsel cross-examined Sharp as follows:
 {¶ 68} "Mr. Grant: Do you know where [defendant] lived before you saw him in city jail?"
 {¶ 69} "The Witness: He stayed with his grandmother on Lakeshore.
 {¶ 70} "Mr. Grant: Where?
 {¶ 71} "The Witness: Down the way.
 {¶ 72} "Mr. Grant: When did he live there?
 {¶ 73} "The Witness: When he got out of juvenile or — as a matter of fact, his exact words were, he was in Lorain before. They did the DNA while the second time when he got out."
 {¶ 74} The state asserts that defendant's counsel "opened the door" for this response. We find this assertion to be well-taken as counsel initiated a line of questioning regarding what he knew about defendant and his personal history. State v. Friedrich
(June 7, 1989), Holmes App. No. CA-391.
 {¶ 75} We further note that no particular previous crime was mentioned by the witness. The parties cannot speculate as to what the jury could or could not infer from this comment . Finally, the trial court instructed the jury to disregard the answer and we presume that they did so.
 {¶ 76} In accordance with the foregoing, we conclude that he trial court did not abuse its discretion in denying the motion for a mistrial.
 {¶ 77} This assignment of error is without merit.
Affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Rocco, J., and Corrigan, J., concur.