OPINION *Page 2 
{¶ 1} The defendant-appellant, Lisa Gonzales, appeals the judgment of the Wyandot County Common Pleas Court convicting her of arson and insurance fraud following jury trial. On appeal, Gonzales argues the jury was tainted during voir dire and there was insufficient evidence to support her convictions. For the reasons set forth herein, we affirm the judgment of the trial court.
 {¶ 2} On January 16, 2008, the Wyandot County Grand Jury indicted Gonzales on one count of arson, a violation of R.C. 2909.03(A)(2), a fourth-degree felony, and one count of insurance fraud, a violation of R.C. 2913.47(B)(1), a fourth-degree felony. At her arraignment, Gonzales pled not guilty to the charges, and the case proceeded to jury trial on July 14 and 15, 2008. The jury found Gonzales guilty on each count, and the trial court journalized those verdicts on July 18, 2008.
 {¶ 3} On July 28, 2008, Gonzales filed a motion for new trial based on allegedly prejudicial statements made by a potential juror, a Catholic friar, in voir dire. In the motion, Gonzales cited case law from Vermont and New Jersey to support the proposition that a defendant need only show that the challenged irregularity had the capacity to influence the jury, not that the irregularity resulted in actual prejudice. The state filed a response, arguing that the friar's statement did not result in prejudice. The trial court filed its judgment entry on August 13, *Page 3 
2008 denying Gonzales' motion. The trial court noted that the friar had appeared in "Church garb" and determined that the words used by the friar were "non specific and not related to any facts involved in the case[.]" Gonzales was subsequently sentenced to concurrent 17-month prison terms. Gonzales appeals the judgment of the trial court and asserts two assignments of error for our review.
 Assignment of Error No. 1 The trial court erred in denying the defendant's motion for a mistrial on account of irregularities in the voir dire jury selection process where certain inflammatory statements were presented to the jury venire thereby tainting the jury pool and pre-disposing the seated jury to find against the defendant prior to the outset of trial.
 Assignment of Error No. 2 The Defendant's conviction was not supported by the sufficiency of the evidence on each element of each count of the indictment.
 {¶ 4} In the first assignment of error, Gonzales contends that the jury pool was biased based on statements made by a potential juror. Specifically, Gonzales challenges comments made by a Catholic friar during voir dire. The following exchange took place between the prosecutor and the potential juror:
 MR. MILLER: Good morning, everyone. Can I see a show of hands, please, who is a little bit nervous about the prospect of serving on a jury, and deciding guilt or innocence?
 * * *
 MR. MILLER: Sir, do I address you as Father Kin?
 RANDALL KIN: Brother.
 MR. MILLER: Friar? *Page 4 
 RANDALL KIN: Yes, friar.
 MR. MILLER: Friar Kin. You had your hand up, sir. What makes you nervous about serving as a juror?
 RANDALL KIN: Well, I just talked to Father J.R. (phonetic) who came over here on Sunday and brought Communion. She — Ms. Gonzales is a member of our parish in Carey, Ohio, and I guess that — other than being sorry for what she did, you know, maybe that was a bad idea that she did it, or something. I don't know a lot about the case, but . . .
 MR. MILLER: Father that would prevent you from serving fairly and impartially, would you agree?
 RANDALL KIN: Yes.
(Trial Tr., Dec. 9, 2008, 28; 30). The friar was dismissed for cause and shortly thereafter, defense counsel requested a sidebar during which she voiced Gonzales' concern about the friar's statements. (Id. at 32-33). The trial court indicated that it would instruct the jury to disregard the statement as unreliable hearsay and to not consider it for any reason. (Id. at 33).
 {¶ 5} After the jury was sworn and outside of its hearing, defense counsel requested a mistrial based on the friar's statement. (Id. at 55). The trial court denied the motion and again indicated that it would provide a curative instruction to the jury. (Id. at 56). The jury was brought into the courtroom, and the court gave its preliminary instructions. At that time, the court told the jury, "[m]y second instruction: The Friar that was here on voir dire, you may recall, made some comments about statements allegedly made by the Defendant to another. These statements are hearsay, and therefore unreliable. You must completely *Page 5 
disregard them and proceed as though you never heard them. Is that understood?" (Id. at 64). The record contains no indicia of the jurors' responses.
 {¶ 6} Gonzales contends that the conversation between the prosecutor and the potential juror establishing the friar's proper title raised his "credibility level" because he "undoubtedly would be viewed by most in a highly revered and reverential light, denotes a high level of trustworthiness, beyond that usually attached to a layman." Gonzales continues:
 It does not take any stretch to characterize her statements to her spiritual advisor and confidant as a confession to the acts for which she was being tried the following day. * * * it is clear that the jury pool was tainted, in the least, if not completely spoiled, considering the small tight communities in rural Ohio and the natural respect for the words of a man of the cloth.
 {¶ 7} Mistrials are necessary "only when a fair trial is no longer possible." State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791,842 N.E.2d 996, at ¶ 160, citing State v. Franklin (1991),62 Ohio St.3d 118, 127, 580 N.E.2d 1.
 The remedy for claims of juror partiality is a hearing in which the defendant has an opportunity to prove actual bias. State v. Phillips (1995), 74 Ohio St.3d 72, 88, 656 N.E.2d 643, citing Smith v. Phillips (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940, 71 L.Ed.2d 78; Remmer v. United States (1954), 347 U.S. 227, 229-230, 74 S.Ct. 450, 98 L.Ed. 654. The defense must establish that the improper communication biased the juror. State v. Keith (1997), 79 Ohio St.3d 514, 526, 684 N.E.2d 47; United States v. Zelinka (C.A.6, 1988), 862 F.2d 92, 95. "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." Phillips, 74 Ohio St.3d at 89, 656 N.E.2d 643. *Page 6 
Id. Trial courts have broad discretion in deciding whether to grant a mistrial. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190,813 N.E.2d 637, at ¶ 92; State v. Brown, 100 Ohio St.3d 51, 2003-Ohio-5059,796 N.E.2d 506, at ¶ 42. An "`abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting State v.Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (citations omitted).
 {¶ 8} On this record, we are not persuaded that the jury was biased by the friar's statements. In State v. Hairston, 4th Dist. No. 06CA3047, 2007-Ohio-4159, the court was faced with multiple statements about the defendant by multiple jurors, yet the court determined that Hairston did not establish prejudice. InHairston:
 several prospective jurors made remarks * * * Those remarks allegedly included one potential juror's comments that he had heard "three black guys" committed the crimes; comments by another potential juror that the Hairstons must be "guilty" because the grand jury had indicted them; and statements by others that they had read newspaper accounts of the incident or are related or know the Melchers. One potential juror, when asked if he could put aside the newspaper account and base his decision only on facts adduced at trial, said that he would "try" to do so.
Id. at ¶ 12. As in Hairston, the potential juror who made the allegedly prejudicial remark was not seated on the jury. Id. at ¶ 14. The friar was dismissed for cause *Page 7 
at the state's request immediately after making his statement and admitting his inability to remain impartial. (Trial Tr., at 30-31). As in Hairston, we must determine if the remaining venire was prejudiced by the friar's remarks, and Gonzales has cited "nothing in the record to demonstrate that these remarks biased or prejudiced the empaneled jurors other than the fact that the remarks occurred." Hairston, at ¶ 14. Prejudice can not generally be presumed but must be affirmatively demonstrated in the record. Id., citing State v. Treesh (2001),90 Ohio St.3d 460, 464, 739 N.E.2d 749. As in Hairston, Gonzales has not made such a showing. Id. The trial court instructed the jury to disregard any statement by the friar as unreliable hearsay and asked the jurors if they understood. There were no transcribed answers from any jurors, and there was no indication by the trial court or either attorney that they had observed any physical reactions that could have be construed as a negative response. Furthermore, defense counsel did not conductany examination of the jury, did not move to strike the entire venire, and used only one peremptory challenge. (Trial Tr., at 43-44; 46; 48-51).
 {¶ 9} We also discount Gonzales' argument that the entire jury pool, and specifically the jurors who were seated, would have given greater credibility to "a man of the cloth." Gonzales' argument presumes that every juror would give greater credibility to a member of the clergy. Second, it presumes that even if any of the jurors found a clergy member to be more credible than the average citizen, *Page 8 
that juror would extend its determination to a Catholic friar. Neither presumption is supported by the record.
 {¶ 10} Finally, we discount Gonzales' argument concerning the semantics of the friar's statement. Gonzales focuses on that portion of the friar's statement wherein he said, "other than being sorry for what she did, you know, maybe that was a bad idea that she did it[.]" InHairston, one of the jurors indicated that the defendant must surely be guilty since the grand jury had indicted him. The court did not find such a direct statement of guilt to be prejudicial. Hairston, at ¶ 15-18. Unlike the direct statement of guilt in Hairston, at most, the friar's statement implied guilt. However, the statement was consistent with evidence later adduced at trial; specifically, Gonzales' own statements to Dennis Cupp, the investigator from the State Fire Marshal's Office, wherein she indicated that she was an alcoholic, abused prescription drugs, and sometimes had blackouts. (Trial Tr., at 183). Gonzales also told Cupp that she must have done something but could not remember the acts. (Id. at 184). Gonzales' statements to Cupp were of the same nature as the statements she made to the Catholic priest, who relayed the information to the friar, who relayed the information in court. Gonzales has failed to demonstrate actual bias on this record. As recognized by the United States Supreme Court and followed by the Supreme Court of Ohio, "`"[a litigant] is entitled to a fair trial but not a perfect one," for there are no perfect trials.'" *Page 9 Grundy v. Dhillon, 120 Ohio St.3d 415, 2008-Ohio-6324, 900 N.E.2d 153, quoting McDonough Power Equip., Inc. v. Greenwood (1984), 464 U.S. 548,553, 104 S.Ct. 845, 78 L.Ed.2d 663, quoting Brown v. United States
(1973), 411 U.S. 223, 231-232, 93 S.Ct. 1565, 36 L.Ed.2d 208, quotingBruton v. United States (1968), 391 U.S. 123, 135, 88 S.Ct. 1620,20 L.Ed.2d 476. See also State v. Lott (1990), 51 Ohio St.3d 160, 166,555 N.E.2d 293; State v. Hollis, 3d Dist. No. 16-08-10, 2009-Ohio-302, at ¶ 34. We cannot hold that the trial court abused its discretion, and the first assignment of error is overruled.
 {¶ 11} In the second assignment of error, Gonzales contends her convictions were not supported by sufficient evidence. As to the arson conviction, Gonzales argues there was no evidence to directly connect her with setting the fires, no evidence to prove the cause of the fires, and no evidence that she had acted with the purpose to defraud. As to the conviction for insurance fraud, Gonzales argues that she claimed a loss of only $1,300 on her claim, which falls short of the $5,000 claim required for the state to prove a fourth-degree felony offense. Gonzales claims she has never made an oral assertion of value, and she did not make a specific claim to repair the damage to her home. The following testimony was presented at trial.
 {¶ 12} John Hall testified that he had been a volunteer firefighter with the Carey Fire Department for 11 years, and that he responded to the fire at Gonzales' *Page 10 
house. Hall stated that all of the doors and windows were locked when the firemen arrived at the residence, and they breached the front door to gain access. (Trial Tr., at 78). Hall extinguished a fire in the corner of the living room by using only five gallons of water. (Id. at 79). After extinguishing the fire, he and other firemen began venting the home by opening windows and doors. (Id. at 79-80). Hall walked through the house and observed that the homeowner appeared to have been remodeling. (Id. at 83). The firemen did not discover a second fire that had burned itself out in a small bathroom until they returned to the scene after lunch. (Id. at 85). In the bathroom, Hall observed open paint cans and containers of paint cleaner. (Id. at 85-86). Hall found the situation to be suspicious and contacted the State Fire Marshal's Office. (Id. at 86). Hall testified that the firemen secured the house with yellow tape and closed the front door, which did not latch since they had breached the door to gain access to the house. (Id. at 87). However, Hall indicated that there was no evidence that anybody else had entered the home while the firemen were away. (Id. at 88).
 {¶ 13} Keith Flaherty had been a volunteer fireman for seven years. He testified that he drew rough floor plans of the house and identified the points of origin for the fires. (Id. at 91). Flaherty found no correlation between the two fires. (Id. at 95). Several other volunteer firefighters testified that they observed open paint cans and painting supplies throughout the house. *Page 11 
 {¶ 14} Jerry Mathern owned the insurance company through which Gonzales' home was insured. He testified that Gonzales' insurance policy with Auto-Owners Insurance Company carried a maximum policy limit of $235,000. (Id. at 128). Mathern testified that he automatically submits claims for fire losses such as that suffered by Gonzales. (Id. at 128-129). Mathern essentially stated that the loss notice, admitted as State's Exhibit 7-C, was an office form that he completed and faxed to the insurance company on the date of loss to initiate the claim. (Id. at 129-130).
 {¶ 15} Shari Hablitzel testified that she lived across the street from Gonzales, and at approximately 8:15 a.m. on September 18, 2007, she observed Gonzales exit her house through the front door. (Id. at 137; 139). Hablitzel watched Gonzales place three or four bags in her vehicle, which required her to make several trips from the house to the vehicle. (Id. at 139-140). Hablitzel testified that Gonzales was walking faster than usual and did not use a cane even though she had had a hip replacement and was experiencing more difficulty with her hips. (Id. at 140). After packing the bags and her cane into her vehicle, Gonzales drove away from her residence. (Id.). Approximately 20 minutes later, the fire department responded to Gonzales' home. (Id. at 141). Gonzales told Hablitzel that she had been painting her house when she had borrowed a Mason jar from Hablitzel so she could clean her brushes. (Id. at 142). *Page 12 
 {¶ 16} Dennis Cupp had been the criminal investigator for the State Fire Marshal for 17 years. (Id. at 147). He was called to investigate the fires at Gonzales' home. Cupp testified that the fire in the bathroom extinguished itself due to lack of oxygen. (Id. at 163). Gonzales told Cupp that she was a smoker and asked if a cigarette could have caused the fires; however, Cupp opined that the fires were not caused by a cigarette. (Id. at 167-169). At a later interview with Gonzales, Cupp asked her about the fires being set intentionally. Gonzales indicated that she did not start any fires in her home but then stated that she must have done something but could not remember doing it. (Id. at 174-175). Gonzales told Cupp that she is an alcoholic, she abuses prescription drugs, and she sometimes blacks out and does not remember events. (Id. at 183). During a subsequent interview, Gonzales told Cupp she was making it by "the seat of her pants" financially. (Id. at 184). Gonzales also told Cupp that the fire "wasn't for insurance purposes." (Id. at 175). Cupp opined that both fires were set intentionally either by striking a match or with a lighter. (Id. at 185). He found no evidence of forced entry into the home (other than the breach caused by the responding firemen) and stated that Gonzales had exclusive possession of the home. (Id.).
 {¶ 17} Deborah Alt was the claims representative for Auto-Owners, which had issued the insurance policy on Gonzales' home. (Id. at 224). Alt testified that *Page 13 
Gonzales submitted a claim for the loss to her home, including a notice, inventory sheet, and an attorney letter. State's Exhibit 11-A was a cover letter from an attorney to Auto-Owners, State's Exhibit 11-B was a proof of loss form, and State's Exhibit 11-D was a personal property inventory. On State's Exhibit 11-B, Gonzales wrote that she had not received the damage estimate for the building, she provided a question mark for the value of personal property damaged, listed $300 for rent as an additional expense, and put a question mark under "other" damages. The personal property inventory included claims for a Stanley steel door, estimated to cost $1,300, a sofa, a recliner, one set of lamps, carpeting, a Zenith television, a Zenith DVD/VCR player, three windows approximately nine feet wide by four feet high, 1 window approximately three feet wide by 4 feet high, a built-in shelving unit, door bell chimes, four sets of lace curtains, nine pillows, a double-hung window approximately three feet wide by four feet high, a thermostat, a ceiling fan, a mattress and box springs set, tiles on a wall, one window approximately two feet wide by three feet high, and a vanity approximately five feet wide by three feet high. Other than the door, Gonzales provided no values for the claimed property.
 {¶ 18} Alt testified that she spoke with Gonzales about the fire, and Gonzales told her that she had been a professional firefighter; that she had gone through the house to make sure everything was okay before she left; and that she *Page 14 
had the only set of keys to the house. (Id. at 232-236). Alt physically inspected the property and, based on her training and experience, used "low" estimates for the property Gonzales had not valued on State's Exhibit 11-D. Using her estimates, Alt testified that the total claim was almost $9,000, with the cost to repair the house alone valued at over $5,000. (Id. at 239-240; 248; 250).
 {¶ 19} Michael Linscott was a fire investigator for SEA Limited and was hired by Auto-Owners to investigate the fire at Gonzales' home. Linscott testified that there was no connecting damage between the separate fires in the living room and the bathroom. (Id. at 263). He opined that there were two origins, and there was "no way" the fires could have "communicated" with each other. (Id. at 275). Linscott stated that if the fires had started at approximately 8:15 or 8:30 a.m., and the firemen had arrived at the house around 9:00 a.m., the damage to the house was consistent with an approximately 45-minute burn time. (Id. at 299). Linscott opined that there was no accidental source of ignition, nor was the cause of the fire related to the dwelling itself. (Id. at 300). He indicated that a path of gasoline had been located in the bathroom, and that the fire had followed that path. (Id. at 304-306). Linscott stated that the fires were incendiary, meaning intentionally started. However, he was unable to ascertain whether a match or lighter had been used to start the fires. (Id. at 311-312). Linscott's conclusion was that there were two origins of fire that were separate and isolated, the source of ignition was a human *Page 15 
act, the cause was incendiary or intentional, the house was secure when firefighters responded to the scene, and Gonzales was the last known person in the dwelling. (Id. at 312).
 {¶ 20} Sufficiency of the evidence is a test of adequacy, used to "`determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, quoting Black's Law Dictionary (6 Ed. 1990) 1433; citing Crim. R. 29(A);State v. Robinson (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. Thompkins, at 386-387, citing Tibbs v. Florida (1982), 457 U.S. 31, 45,102 S.Ct. 2211, 72 L.Ed.2d 652, citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed .2d 560.
 {¶ 21} In reviewing a claim under the sufficiency of the evidence standard, an appellate court must determine "`whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Bridge, 3d Dist. No. 1-06-30, 2007-Ohio-1764, quoting State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in State v.Smith (1997), *Page 16 80 Ohio St.3d 89, 684 N.E.2d 668. A conviction may be sustained on circumstantial evidence. See State v. McKnight, 107 Ohio St.3d 101,2005-Ohio-6046, 837 N.E.2d 315, at ¶ 75, quoting State v. Heinish
(1990), 50 Ohio St.3d 231, 238, 553 N.E.2d 1026.
 {¶ 22} As to count one, Gonzales was convicted of arson under R.C. 2909.03(A)(2), which states: "[n]o person, by means of fire or explosion, shall knowingly do any of the following: * * * [c]ause, or create a substantial risk of, physical harm to any property of the offender or another, with purpose to defraud." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "`Physical harm to property' means any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment. `Physical harm to property' does not include wear and tear occasioned by normal use." R.C. 2901.01(A)(4).
 {¶ 23} The evidence in this case was clear that there were two separate fires in Gonzales' home. Both investigators, Cupp and Linscott, ascertained that the fires were started with either a match or a lighter. The jury heard that Gonzales had the only set of keys to the residence; that all of the doors and windows were *Page 17 
locked upon the firefighters' arrival; and that Gonzales was the last person seen leaving the house. The evidence, including all of the photographic exhibits, showed that both the living room and the bathroom had sustained fire damage, and almost every other area of the house had sustained smoke or a combination of smoke and heat damage, which certainly interfered with Gonzales' use of the house. This fact is further supported by Gonzales' receipt of $1,500 from Auto-Owners so she could find alternative living arrangements and evidence that Gonzales had resided at a motel in Findlay, Ohio for a period of time following the fire. (Trial Tr., at 182; 239-240).
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
R.C. 2901.22(A). The evidence introduced to support the element of "purpose to defraud" were the statements Gonzales related to Cupp and the insurance claim itself. Gonzales told Cupp she was making it by "the seat of her pants" financially. Although this conversation occurred some time after the fire, the jury was entitled to weigh that statement.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. Additionally, Gonzales told Cupp that the fires had not been for the insurance money. Finally, State's Exhibits 11-A, 11-C, and 11-D show that Gonzales submitted paperwork to process an insurance claim, in which she *Page 18 
essentially swore that she did not cause the loss. Again, the jury was in the best position to weigh the evidence and assess credibility. Construing all of the evidence in favor of the state, as we must, we hold that the evidence was sufficient to support the arson conviction, even if some of the evidence was circumstantial.
 {¶ 24} As to the second charge, insurance fraud, R.C. 2913.47(B)(1), (C) states:
 No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following: Present to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive[.]
 * * *
 Whoever violates this section is guilty of insurance fraud. * * * If the amount of the claim that is false or deceptive is five thousand dollars or more and is less than one hundred thousand dollars, insurance fraud is a felony of the fourth degree.
Based on the evidence set forth in our discussion of the arson charge, there is sufficient evidence to support a conviction for insurance fraud. Gonzales has cited no case law to support her argument that Alt was unable or otherwise unqualified to render estimates for the personal property Gonzales had listed on her personal property loss form. Despite the fact that Gonzales estimated the cost of a replacement front door, the damage to the structure and her personal belongings was valued at approximately $9,000, using Alt's "low" estimates. Alt also stated that the damage to the structure alone was valued at over $5,000. Alt walked *Page 19 
through the residence and observed the damage first-hand, and she had been trained through Vail Tech to do "homeowners estimatics and auto estimatics." (Trial Tr., at 238-239).
 {¶ 25} Convictions for insurance fraud have been upheld where an insurance company's claims investigator has testified to the value of the lost property. In State v. Becker, 6th Dist. No. H-05-008, 2006-Ohio-4299, at ¶ 22, the defendant submitted an insurance claim for his "stolen" truck. Without objection, the claims investigator testified at trial that the truck was valued at more than $5,000. Id. This case presents a similar scenario. Alt testified based on her personal knowledge, training, and experience as to the value of Gonzales' damaged property. Defense counsel did not object to Alt's estimates. As stated above, Gonzales' submission of her proof of loss form contained a statement that she had not violated the terms of the insurance contract or otherwise concealed any fact. Construing this evidence in favor of the state, there was sufficient evidence to support the conviction for insurance fraud. The second assignment of error is overruled.
 {¶ 26} The judgment of the Wyandot County Common Pleas Court is affirmed.
Judgment Affirmed
 SHAW, J., concurs. *Page 20