[Cite as *State v. Potts*, 2023-Ohio-954.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 2022 CA 00045 |
| | : | |
| TODD POTTS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Case No. 2021CR0443

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      March 22, 2023

APPEARANCES:

For Plaintiff-Appellee:

KYLE L. STONE
STARK COUNTY PROSECUTOR

TIMOTHY E. YAHNER
110 Central Plaza South, Suite 510
Canton, OH 44702-1413

For Defendant-Appellant:

ELI R. HELLER
TAD ORVAL HOOVER
527 Portage Trail
Cuyahoga Falls, OH 44221

*Delaney, J.*

{¶1} Defendant-Appellant Todd Potts appeals his March 25, 2022 convictions and sentence by the Stark County Court of Common Pleas. Plaintiff-Appellee is the State of Ohio.

## FACTS AND PROCEDURAL HISTORY

### Indictment

{¶2} On March 17, 2021, the Stark County Grand Jury indicted Defendant-Appellant Todd Potts on six charges: (1) Kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(2)(3); (2) Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(1)(D)(1)(a); (3) Abduction, a third-degree felony in violation of R.C. 2905.02(A)(3); (4) Domestic Violence, a third-degree felony in violation of R.C. 2919.25(A)(D)(4); (5) Disrupting Public Service, a fourth-degree felony in violation of R.C. 2909.04(A)(3); and (6) Aggravated Menacing, a first-degree misdemeanor in violation of R.C. 2903.21(A)(B). Potts entered a not guilty plea to the charges.

### Jury Trial

{¶3} Prior to the start of the March 14, 2022 jury trial, the State dismissed Count Five, Disrupting Public Service.

{¶4} The trial court then asked the parties if they had any motions to present prior to jury selection. The State told the trial court that it had the recording of the 911 call from the victim and the recording was provided to Potts prior to trial. (T. I/18). Potts objected to the introduction of the 911 call because the State provided the recording two or three weeks before trial. Further, the contents of the 911 call were more prejudicial than probative. (T. I/19). The trial court found no discovery violation and denied the motion

to exclude but would revisit the issue of prejudice when the parties listened to the 911 call in chambers. (T. I/20). After opening statements, the trial court revisited Potts' objection to the 911 call on the basis of prejudice. (T. I/150). The trial court requested the State play the 911 call outside the presence of the jury. The State told the trial court that based on Potts' request, it was going to redact the 911 call to eliminate a question to the victim of whether "he has done this before" and the victim answered yes. (T. I/153). Potts responded that he objected to the 911 call, either redacted or in its entirety, based on the State's failure to comply with discovery and that the call was more prejudicial than probative. (T. I/152). The trial court overruled Potts' objection and allowed the introduction of the 911 call; the trial court would allow Potts to select the introduction of the full or redacted version of the 911 call. (T. I/153). Potts chose the redacted version. (T. I/153).

{¶5}   The following evidence was heard on the remaining five charges.

<u>M.E., The Alleged Victim</u>

{¶6}   The State called M.E., the alleged victim, as its first witness. M.E. met Potts in 2006, when he was in prison. (T. I/197). M.E. testified that she married Potts in 2007 and divorced him in 2014. (T. I/156).

{¶7}   On cross examination, M.E. testified that Potts was released from prison in 2007 but was reincarcerated after five months for a parole violation of no contact with M.E. (T. I/199). He was released in 2008 and reincarcerated in April 2008 based on a parole violation of violence towards M.E. (T. I/200). In 2009, Potts was released from prison but reincarcerated for a parole violation that he kidnapped M.E. (T. I/200). After Potts was released from prison in 2009, he moved to Kentucky, and M.E. moved to Kentucky to be with him. (T. I/201). After a week together, M.E. alleged to the Kentucky

authorities that Potts committed domestic violence against her. (T. I/201). M.E. moved back to Ohio and Potts returned to Ohio in 2011. (T. I/202). Potts and M.E. lived together in Tuscarawas County when M.E. alleged domestic violence and kidnapping against Potts. (T. I/202). In 2013, Potts was convicted for domestic violence against M.E. in Stark County and sent to prison until 2016. (T. I/205, 209).

{¶8} After the 2014 divorce, M.E. stopped communicating with Potts, but in 2017, she started communicating with him again after he contacted her through Facebook. (T. I/157). They met at a park, began speaking on the phone, went out to dinner, went to church functions, and engaged in intimacy. (T. I/158). M.E. testified that she communicated to Potts that she loved him, but she was not in love with him. (T. I/158).

{¶9} In March 2020, M.E. and Potts were at church where she heard Potts telling the pastor how much he loved her and that they were going to get married. (T. I/160). Later that day, M.E. told Potts that their relationship could not go any further and she did not want to get married. (T. I/161).

{¶10} On Saturday, March 21, 2020, M.E. participated in church activities during the day. Potts called and texted her repeatedly during the day, but M.E. did not respond. (T. I/164). At 5:30 p.m., M.E. left the church and spoke with Potts on the phone. He asked why she had not responded earlier, but she stated she was busy. M.E. testified that Potts said she had promised they would get together, which M.E. acknowledged, but she expressed that she needed time alone. (T. I/165). Potts offered to bring her take-out dinner and M.E. accepted his offer. (T. I/167).

{¶11} M.E. testified she got to her home a little bit before 6:00 p.m. (T. I/168). Potts arrived at M.E.'s home with take-out food from Dairy Queen. (T. I/168). M.E. said

that while they were getting the food ready in the kitchen, Potts brought up the things she had told him last week and began to get upset with her. (T. I/169). M.E. testified she was sitting in her kitchen chair when she asked Potts to leave. (T. I/170). She asked him to leave again when Potts stood up, grabbed her by the neck, picked up the chair with her in it, and threw her backwards onto the floor, snapping the chair in half. (T. I/170, 217). M.E. testified the food on the table did not spill because Potts pushed her away from the table. (T. I/215). He started strangling her and she couldn't move. He took his thumb, pushed it into her eye and punched her. When he punched her, he let go of her throat so she could grasp for air, but then he started strangling her again. (T. I/170). M.E. testified that she believed she was rendered unconscious for a period of time because when Potts arrived, it was daylight, and then it was dark outside when she woke up dizzy and disoriented with someone was yelling at her. (T. I/171). M.E. remembered Potts kicking her and yelling at her to "get the fuck up." (T. I/171). She rolled over onto all fours and slowly got up. (T. I/171).

{¶12} M.E. testified that Potts yelled at her to get up, threatened her with death, including slaughtering her and blowing her head off with the machete and guns in his car. (T. I/172). She stood up but then dropped to her knees and begged him not to do this. (T. I/173). M.E. said Potts kept yelling at her, and then he grabbed her by her hair and shirt, pulling her down two flights of stairs to the lower level, pushing her into furniture. (T. I/174). M.E. saw her cell phone fall, but she did not know where it landed. M.E. could see from the T.V. clock that it was 9:40 p.m. (T. I/175). Potts continued to yell at her, and M.E. testified that she felt dizzy and faint, and had at some point, urinated on herself. (T. I/175). M.E. asked Potts if she could go to the bathroom, but Potts told her he was not letting her

go and she was coming to his van. M.E. refused and she testified that Potts then threatened to gut her. (T. I/176).

{¶13} Potts took her to the bathroom, then he used the bathroom. (T. I/177). He took her out of the bathroom, and they stood in the hall where he told her she was coming to his van, and she refused. (T. I/177). He took her to the loveseat where they sat together, when Potts started to calm down and apologized to her. (T. I/178). As they were talking, M.E. told Potts that he needed to leave because her daughter and boyfriend would be home soon, but Potts said he would kill them too. (T. I/180). M.E. has two adult children, but there were no children as issue of her marriage with Potts. In March 2020, M.E. was living with her daughter, her daughter's boyfriend, and her two grandchildren. (T. I/156).

{¶14} Potts stood up, walked up the stairs, and asked M.E. for a hug, to which she reluctantly obliged. (T. I/181). He asked her not to call the police because he showed her mercy, then he left the house. (T. I/181).

{¶15} M.E. locked the door and ran downstairs to find her cell phone. She called 911 on her cell phone, when Potts started calling her on the phone. (T. I/182). M.E. testified that her daughter came into the house while her boyfriend was outside smoking. (T. I/182). M.E. testified that once her daughter saw her, her daughter started calling 911 at the same time as she was. (T. I/183).

{¶16} The State requested to play M.E.'s 911 call, to which Potts objected on the basis of improper foundation by not calling the 911 operator as a witness. (T. I/183). The trial court overruled the objection and permitted the introduction of the redacted 911 call. (T. I/183). After the 911 call was played, the State asked M.E. if that was the 911 call she

made on March 21, 2020, to which M.E. answered, yes. (T. I/184). Potts renewed his objection to the admission of the 911 call, which the trial court denied. (T. II/95).

{¶17} After the Lawrence Township Police arrived at her home, M.E. went to the hospital by ambulance. M.E. testified she was scared and screaming when she walked out of the house to the ambulance because she believed Potts was outside the house and going to shoot her. (T. I/191). M.E. described her injuries caused by Potts, which included bruising under her eye, red marks on her body, forehead, face, and neck, bruising on her tongue after she bit it when Potts threw her to the floor, and head pain.

{¶18} During her cross examination, M.E. was asked about the victim statement she gave to the police. (T. I/222). The victim statement was dated March 23, 2020 and M.E. testified that she filled out the statement either in the hospital or the day after. (T. I/223). She was asked about the differences in her victim statement and her testimony, such as her testimony that Potts kicked her and that she urinated on herself, but that information was not in her statement to the police. (T. I/230, 231).

{¶19} On re-direct examination, the State asked M.E. to read the entirety of her victim statement to the jury, upon which Potts objected. (T. I/243-244). Potts argued it was inappropriate for the M.E. to read the entire statement because it was akin to M.E. testifying again. The State responded that Potts opened the door when he asked M.E. about snippets from the statement. The trial court found that Potts' line of questioning focused on what was *not* in M.E.'s statement, so that opened the door to inquire as to what *was* in the statement, thereby overruling Potts' objection to the statement. (T. I/245). M.E. then read the entirety of her victim's statement to the jury. (T. I/246). Potts was permitted to conduct a recross examination where he inquired as to the differences in

M.E.'s victim statement, the statements she made to the Lawrence Township Police, and her direct testimony. (T. I/253).

### A.K., Daughter of M.E.

{¶20} M.E.'s daughter testified that she lived with her mother on March 21, 2020. (T. I/256). She arrived home at 10:00 – 10:20 p.m. (T. I/268). When she entered the house, M.E. asked her where her boyfriend was and said that he's out there with a gun. A.K. found her mother in the basement and saw her injured face. (T. I/257). A.K. described her mother's eye as very red, there were little red spots all over her face, and she saw her injured tongue. (T. I/263). A.K. ran out of the house, then came back in the house, and went into the kitchen. She saw the Dairy Queen on the table and the chair with a chair-back broken in half on the floor; she picked up the chair and put it back in place, but they threw the chair away later because it could not be fixed. (T. I/259). She saw Potts' wire-framed glasses in the kitchen, and she threw them on the floor to stomp on them. (T. I/261).

### Emergency Responders

{¶21} Brittney Fleming, a firefighter and paramedic, was dispatched to M.E.'s home on March 21, 2020. (T. I/278). Fleming stated that M.E. appeared to be injured with bruising and swelling to her left eye, tenderness and bruising on her back, and tenderness in her head. M.E. reported to Fleming that she had lost consciousness. (T. I/281). Fleming transported M.E. to the hospital in the ambulance. Fleming did not determine how M.E. received the injuries. (T. I/288).

{¶22} Patrolman Madalyn Klemp of the Lawrence Township Police Department testified that she was dispatched to M.E.'s home on March 21, 2020 after a report of

domestic violence. When she got to M.E.'s home, she first saw A.K. then M.E., sitting on the downstairs couch. (T. II/12). M.E. was visibly upset. M.E. gave Officer Klemp a brief, verbal summary of what happened before she was transported to the hospital. Officer Klemp provided M.E. with a domestic packet that contains a written statement and a temporary protection order. M.E. started filling out the written statement on March 21, 2022 but it was not finished that night. (T. II/17). Officer Klemp noticed injuries to M.E.'s eye, neck, face, tongue, and lower back, of which she took photographs. M.E. did not tell Officer Klemp she had urinated on herself during the incident and Officer Klemp did not notice that M.E.'s pants were wet. (T. II/43). When M.E. left the house to get into the ambulance, Officer Klemp observed that she was scared and had to walk with two officers and the paramedic. (T. II/22).

{¶23} Officer Klemp sent out a BOLO for Potts, but he was not located. (T. II/14). He was later located in Pennsylvania. (T. II/75). Officer Klemp observed the kitchen and saw the Dairy Queen on the table but did not get a confirmation of which chair M.E. was sitting in, so she did not feel comfortable adding that in her report. (T. II/26). She did not look for any damage to the kitchen chairs. (T. II/48). Officer Klemp did not look in the Dairy Queen bag for a receipt. (T. II/51). During cross examination, Officer Klemp's body camera video taken on March 21, 2020 was shown to the jury. (T. II/59). Officer Klemp did not review M.E.'s phone records to confirm that Potts had been repeatedly calling and texting her. (T. II/69). The body-cam video, however, displayed M.E. showing her cell phone to Officer Klemp, which showed Potts' had called her several times. (T. II/82). Officer Klemp agreed that aside from M.E.'s statement that Potts was at her home, she had no evidence aside from M.E.'s claims that he was there. (T. II/72).

{¶24} At the conclusion of the State's case, Potts moved to dismiss the charges pursuant to Crim.R. 29. (T. II/99). The trial court denied the motion. (T. II/102).

Potts' Testimony

{¶25} Potts testified on his own behalf.

{¶26} Potts testified that he and M.E. met while he was in prison, and they were married in 2007. By October 2007, Potts was reincarcerated for six months on a parole violation because a family member wrote a letter to the Adult Parole Authority stating that Potts was abusing M.E. (T. II/109). He was released from prison in 2008 with a no-contact order between him and M.E. (T. II/110). M.E. and Potts did not comply with the no-contact order, and he was sent back to prison for a parole violation for six months. He was released in March 2009. (T. II/110). In 2009, M.E. alleged domestic violence against Potts that did not result in criminal charges but he was reincarcerated for a parole violation. (T. II/112). After he was released, he transferred his parole and moved to Kentucky. M.E. moved to Kentucky with him and in 2010, Potts was arrested for domestic violence against M.E. (T. II/114). Potts testified he pled out and returned to Ohio with M.E. (T. II/114). He and M.E. lived together in Tuscarawas County. In 2011, he was charged with kidnapping, rape, grand theft auto, and domestic violence against M.E. (T. II/115). Potts testified that M.E. did not show as a witness, and he was acquitted of the charges. (T. II/115). After the trial, Potts was charged with a parole violation, sent to prison for six months, and released in 2012. (T. II/117). In 2012, he spent six more months in prison for a parole violation. (T. II/118).

{¶27} Potts testified that M.E. started communicating with him in 2017. (T. II/121). They were dating in 2018 to 2019. (T. II/128). He and M.E. lived together for a period of

time at an apartment in Green, Ohio where he financially supported her, but she moved out. (T. II/130). On approximately March 10, 2020, he testified that he gave M.E. a letter in which he told her he was ending the relationship. (T. II/131). He said he tried to contact M.E. after the letter but she did not respond to his calls. (T. II/133).

{¶28} Potts testified M.E. invited him to come to her house on March 21, 2020 but M.E. canceled on the morning of March 21, 2020; so on March 21, 2020, Potts was never inside M.E.'s house. (T. II/134). He did not bring her Dairy Queen. (T. II/134). He was never in M.E.'s home, never caused her injuries, and did not know how she got those injuries. (T. II/136, 138). He argued that he has been accused multiple times of hurting M.E. and M.E. was always the only witness to Potts' alleged actions. (T. II/137).

{¶29} On cross examination, the State noted that Potts testified M.E. was the only person who ever accused him of abusing them. (T. II/145). Potts answered, "Correct. No one's ever said or accused me of abusing her other than through family and letters, like I mentioned earlier." (T. II/145). The State asked Potts if he was in prison for a conviction of kidnapping. (T. II/145). Potts objected on the grounds that Potts was convicted of kidnapping, an offense that occurred prior to 2005. He argued it was outside the 10-year scope for impeachment purposes. (T. II/146). The State said that Potts was convicted of kidnapping, and GSI while he was in prison, and he was released in 2007. He was on parole for those offenses for 10 years, which was within the 10-year time limit since the time of the current offense. (T. II/146). The trial court overruled the objection because Potts opened the door by his testimony that he was on post-release control in 2007. (T. II/146). The State inquired and Potts testified that he was convicted of kidnapping on April 3, 2000 and gross sexual imposition on May 13, 2002, prior to his relationship with M.E.

(T. II/147). He was sentenced to prison and released in 2007, for which he was on parole for 10 years. (T. II/148).

{¶30} The State next asked Potts if he had been texting M.E., including on March 21, 2020. (T. II/148). Potts testified the only text he got from M.E. was her cancelling. (T. II/148). The State then asked, "Isn't it true that you texted her at 5:00 and asking her if she wanted to go to dinner?" (T. II/148-149). Potts objected. He argued that he believed the State was going to use M.E.'s phone from 2020 to introduce text messages, but the phone had not been in the care and custody of the police since that time so that the text messages could be authenticated. (T. II/149). The trial court ruled that the State was permitted to ask Potts if he said those things, and if it needed to recall a rebuttal witness to testify to it; but if Potts said no, the State cannot inquire further. (T. II/150).

{¶31} The State asked Potts what his cell phone number was on March 21, 2020, and Potts responded he could not remember. (T. II/151). The State next asked:

Q. Okay. Do you recall texting back and forth with [M.E.] on that day asking her to contact you; do you recall that?

A. No.

Q. Do you recall her actual response to you that she was sorry, she had no idea it was this late, had a meeting and got pulled into other stuff at the church; do you recall that?

A. I remember her cancelling, yes.

Q. And do you recall you responding back saying, Okay, so now what are you going to do –

(T. II/151). Potts objected. He argued the text messages referred to by the State were never provided in discovery and there was a *Brady* violation. (T. II/152). Potts argued he timely filed a discovery demand and the text messages were never provided; therefore, the text messages should be excluded as a discovery violation. (T. II/154). The State conceded the text messages were not offered on direct because they were not timely given to Potts, but then Potts took the stand indicating there was only one communication on March 21, 2020 of M.E. canceling with Potts. (T. II/155). The trial court sustained the objection to exclude the text messages from March 21, 2020. (T. II/155). The trial court understood there were text messages dated from the 17th through the 19th that were properly provided to counsel in discovery. (T. II/155). Potts objected to the admission of those text messages because the evidence was not properly preserved. (T. II/156). The trial court stated:

> Court will note that established case law provides that text messages can come in as statements as long as they can be authenticated and authenticated as required that they be held in the custody of any sort of law enforcement, which is the individual to whom the text messages were sent or to whom sent them to the number can verify that. * * * the Court is citing to State versus Bickerstaff, 2015-Ohio-4014.

(T. II/157). If M.E. was brought back on rebuttal, she would be subject to cross examination on that issue. (T. II/157).

{¶32} The State asked Potts if he communicated with M.E. by text on the 16th, the 17th through the 19th. Potts stated he could not recall. The State then read the texts to Potts. (T. II/159). Potts objected, arguing that he testified that he did not recall, and it

was an improper method to refresh his recollection. (T. II/161). The trial court overruled the objection, but only allowed the State to ask if Potts remembered texting M.E. on this date and show him the phone, if that refreshed his memory. (T. II/161). The State showed Potts the March 16, 2020 text and he denied it came from his phone number. (T. II/163). The State asked Potts about texts received by M.E. on March 16th through the 19th, 2020, and Potts did not remember sending the texts. (T. II/166).

{¶33} Potts then rested and renewed his motion for dismissal pursuant to Crim.R. 29. The trial court denied the motion.

{¶34} The State called M.E. as a rebuttal witness. M.E. testified that she provided the State her cell phone and charger about one week before the jury trial. (T. II/171). She said the last time she used the cell phone was over two years ago. (T. II/171). She could not recall Potts' cell phone number from March 21, 2020, but had put his phone number in her contacts; when shown the phone, she recognized Potts' cell phone number. (T. II/172). On cross examination, M.E. testified that she had provided pictures of some of the text messages to the Lawrence Police Department in December 2021 to January 2022. M.E. had exclusive control of the phone from March 2020 to January 2022. (T. II/175).

{¶35} The State told the trial court that it had copies of the text messages provided in discovery, which M.E. authenticated, and moved to enter those into evidence. (T. II/178). Potts renewed his objection, which the trial court overruled and permitted the copies of the text messages be admitted. (T. II/178).

**Jury Verdict**

{¶36} The jury reached its verdict on March 16, 2022. It found Potts not guilty of Count One, Kidnapping; and Count Three, Abduction. The jury found Potts guilty of Count Two, Felonious Assault; Count Four, Domestic Violence; and Count Six, Aggravated Menacing.

**Sentencing**

{¶37} The trial court held a sentencing hearing on March 25, 2022. At the hearing, Potts moved the trial court for a new trial. (T. 8). The motion for new trial was based on the cell phone that was produced into evidence by the State. The trial court denied the motion for mistrial. (T. 20). It then proceeded to sentencing, where the trial court sentenced Potts to an aggregate mandatory minimum prison term of eight years up to a maximum prison term of twelve years.

{¶38} The sentencing entry was journalized on March 25, 2022 and it is from this judgment entry that Potts now appeals.

**ASSIGNMENTS OF ERROR**

{¶39} Potts raises six Assignments of Error:

{¶40} "I. THE TRIAL COURT ERRED WHEN IT FAILED TO DECLARE A MISTRIAL AFTER THE STATE ATTEMPTED TO INTRODUCE EVIDENCE NOT PROVIDED IN DISCOVERY.

{¶41} "II. THE TRIAL COURT ERRED WHEN IT IMPROPERLY ALLOWED A 911 RECORDING TO BE PLAYED TO THE JURY.

{¶42} "III. THE TRIAL COURT ERRED WHEN IT PERMITTED IMPROPER CHARACTER EVIDENCE UNDER C.R. 403 AND 404 AND 609.

{¶43} "IV. THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE'S WITNESS TO READ HER ENTIRE WITNESS STATEMENT TO THE JURY ON RE-DIRECT.

{¶44} "V. THE JURY MADE A RULING AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶45} "VI. THE CUMULATIVE EFFECT OF ERROR COMMITTED AT THE TRIAL COURT PREJUDICED THE APPELLANT'S RIGHT TO A FAIR TRIAL."

**ANALYSIS**

**I.**

{¶46} In his first Assignment of Error, Potts contends the trial court erred when it denied his motion for a mistrial. We disagree.

{¶47} At the sentencing hearing, Potts made a motion requesting a new trial based on M.E.'s cell phone.[1] He argued that the State improperly attempted to introduce text messages sent by Potts to M.E. on March 21, 2020 that were not provided to Potts in discovery, and this rose to the level of a *Brady* violation. Potts acknowledged he should have made the motion during trial when he objected to the State's introduction of the March 21, 2020 text message on M.E.'s cell phone. He also conceded the State sustained his objection to exclude the March 21, 2020 text messages.

{¶48} Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. *Matter of P.K.*, 5th Dist. Guernsey No. 19 CA 08, 2019-Ohio-2311, 2019 WL 2451050, ¶ 11 citing

---

[1] At the sentencing hearing, Potts moved for a new trial. On appeal, Potts argues the trial court erred in not granting a mistrial.

*Brady*, 373 U.S. 83, 87. The Supreme Court has explained, "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).

{¶49} In *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990), the Ohio Supreme Court rejected a claim that the state's failure to provide exculpatory information to the defendant prior to trial was a reversible *Brady* violation. First, the Court noted that in *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), the United States Supreme Court noted that the rule of *Brady* applies to situations involving the discovery, after trial, of information which was known to the prosecution but unknown to the defense. In *Wickline*, the alleged exculpatory records were presented during the trial, and therefore no *Brady* violation existed. 50 Ohio St.3d at 116, 552 N.E.2d 913. *Accord, State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 82; *State v. Green*, 90 Ohio St.3d 352, 372, 2000-Ohio-182, 738 N.E.2d 1208.{¶13} Second, the court in *Wickline* noted that Crim. R. 16(E)(3), which is now Crim.R. 16(L)(1), provides:

> [The trial court may make orders regulating discovery not inconsistent with this rule.] If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

*Matter of P.K.*, 5th Dist. Guernsey No. 19 CA 08, 2019-Ohio-2311, 2019 WL 2451050, ¶¶ 12-13. The trial court is permitted to regulate discovery through Crim.R. 16, which includes sanctions in Crim.R. 16(L)(1).

{¶50} In this case, the State conceded during trial that it provided Potts with text messages from March 16th through the 20th in its discovery response, but it did not provide Potts with the text messages from March 21, 2020. Potts did not discover the existence of the March 21, 2020 text messages after the trial -- Potts raised the motion for mistrial after the trial.

{¶51} Pursuant to its authority under Crim.R. 16(L), the trial court sustained Potts's objection and prohibited the State from questioning Potts as to the March 21, 2020 text message. Potts argues the exclusion of the March 21, 2020 text message was not a severe enough sanction. He states that he was required to continually object to the State's line of questioning as to the text messages, therefore losing credibility in the jury's mind and the only remedy to prevent a due process violation was to declare a mistrial. In *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983), the Ohio Supreme Court observed the trial court has discretion in determining a sanction for a discovery violation. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. Further, "'[a] trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery' applies equally to discovery violations committed by the state and to discovery violations committed by a criminal defendant." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, syllabus.

{¶52} For two reasons, we disagree with Potts that the trial court should have imposed a more severe sanction based on his objection. First, in the preliminary jury instructions, the trial court told the jury that "[i]f a question is asked and the objection to the question is sustained, you will not hear the answer and you must not speculate as to what the answer might have been or as to the reason for the objection. If an answer is given to a question and the Court then grants a motion to strike out the answer, you are to completely disregard such question and answer and not consider them for any purpose. A question in and of itself is not evidence and may not be considered by you only as it supplies meaning to the answer." (T. I/127). "A presumption always exists that the jury has followed the instructions given to it by the trial court." *State v. Spencer*, 5th Dist. Licking No. 2021 CA 00085, 2023-Ohio-596, 2023 WL 2317187, ¶ 65 quoting *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus, rehearing denied, 54 Ohio St.3d 716, 562 N.E.2d 163.

{¶53} Second, in the March 21, 2020 text message, Potts allegedly texted M.E. at 5:00 and asked her if she wanted to go to dinner. (T. II/148). Potts, however, testified during his direct examination that he had plans to go to M.E.'s house on March 21, 2020: Potts testified:

A. And then one day I get the invitation to come over there, and then that morning when I got up, she called me and we talked and she canceled; so I never even made it to the house at all. And the reason that is, she said, because she had meetings to go to, she had this to do, * * *

Q. Okay. So let me get this straight. We're talking about March 21, now; is that right?

A. Right.

Q. And on March 21 there had been some sort of plan for you to go over to the house; is that correct?

A. Right.

Q. And then that plan, what happened to that plan?

A. Canceled.

(T. II/133-134). Based on Potts' own testimony as to March 21, 2020, we find no prejudice as to State's reference to the March 21, 2020 text message, which was then stricken by the trial court.

{¶54} The trial court did not abuse its discretion in determining the appropriate sanction for the State's discovery violation was the exclusion of the March 21, 2020 text message and not to declare a mistrial.

{¶55} Potts' first Assignment of Error is overruled.

**II.**

{¶56} In his second Assignment of Error, Potts argues the trial court abused its discretion when it permitted the State to play M.E.'s redacted 911 call to the jury. We disagree.

{¶57} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *State v. Romy*, 5th Dist., 2021-Ohio-501, 168 N.E.3d 86, ¶ 49 citing *Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). The appellate court must limit its review of the trial court's admission or exclusion of evidence to whether the trial court abused its discretion. Id. The abuse of

discretion standard is more than an error of judgment; it implies the court ruled arbitrarily, unreasonably, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶58} Potts objected to the introduction of the redacted 911 tape for two reasons: (1) it was not properly authenticated, and (2) it was more prejudicial than probative.

{¶59} Under Evid.R. 901 (A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This rule invokes a very low threshold standard, requiring only sufficient foundational evidence for the trier of fact to conclude that the item is what the proponent claims it to be. *State v. Nigro*, 5th Dist. Stark No. 2021CA00084, 2022-Ohio-2864, 2022 WL 3447886, ¶ 35 quoting *State v. Roseberry*, 197 Ohio App.3d 256, 268, 2011-Ohio-5921, 967 N.E.2d 233, 242, ¶ 65 (8th Dist.). This standard is less demanding than preponderance of the evidence. *Id.* The proponent must demonstrate only a "reasonable likelihood" that the evidence is authentic, which may be supplied by the testimony of a witness with knowledge. *Id.*; Evid.R. 901(B).

{¶60} Evid.R. 901(B)(1) permits authentication by a witness with knowledge that the 911 call was what it claims to be; Evid.R. 901(B)(5) and (6) permit authentication through voice identification by the speaker in the recording and that the call was made to a particular number, such as 911. M.E. testified that she called 911 on March 21, 2020. She listened to the redacted 911 tape and stated that was the 911 call that she made on March 21, 2020. (T. I/184). These circumstances provided the trial court with an ample basis for admitting the redacted 911 call under Evid.R. 901(B).

{¶61} Evid.R. 403 excludes evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Potts states that after the redacted 911 call was played for the jury, the State asked no questions about the call other than to authenticate the call. He argues the State utilized the redacted 911 call not to assist the jury in understanding the sequence of events but to affect the emotions of the jury.

{¶62} Upon the deferential abuse of discretion standard of review, we find no error for the admission of the redacted 911 call. M.E. testified that after Potts assaulted her, he left her home. When he left the home, M.E. found her cell phone and called 911. The redacted 911 call was used to corroborate M.E.'s testimony as to the sequence of events and to rebut Potts' claim that he was not at M.E.'s home on March 21, 2020.

{¶63} We find no error to admit the redacted 911 call and overrule Potts' second Assignment of Error.

### III.

{¶64} Potts argues in his third Assignment of Error that the trial court abused its discretion when it permitted the State to ask Potts about his 2000 kidnapping conviction and 2002 gross sexual imposition conviction. We disagree.

{¶65} The focus of Potts' arguments in his third Assignment of Error is on Evid.R. 609. Evidence Rule 609 controls impeachment by evidence of conviction of a crime. In pertinent part, it reads as follows:

(A) General Rule. For the purpose of attacking the credibility of a witness:

(1) subject to Evid.R. 403, evidence that a witness other than the accused

has been convicted of a crime is admissible if the crime was punishable by

death or imprisonment in excess of one year pursuant to the law under which the witness was convicted.

(2) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(3) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance.

(B) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, or the termination of community control sanctions, post-release control, or probation, shock probation, parole, or shock parole imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient

advance written notice of intent to use such evidence to provide the adverse

party with a fair opportunity to contest the use of such evidence.

The interplay between Evid.R. 609(A) and 609(B) has been stated as follows.

"What we have here is a rule, an exception to the rule, and then, an

exception to the exception. To attack a defendant's credibility, evidence of

his prior convictions may be introduced. This is the rule in Evid.R.

609(A)(2). Where the conviction is more than ten years old, however, it is

not admissible. This is the exception in Evid.R. 609(B). Where the probative

effect of the ten-year-old conviction [substantially] outweighs the prejudicial

effect of its admission, the court may admit it. This is the exception to the

exception."

*In re P.C.*, 2021-Ohio-1238, 171 N.E.3d 808, ¶¶ 77-78 (3rd Dist.) quoting *State v. Sommerville*, 9th Dist. Summit No. 25094, 2010-Ohio-3576, 2010 WL 3028138, ¶ 5, quoting *State v. Fluellen*, 88 Ohio App.3d 18, 22, 623 N.E.2d 98 (4th Dist.1993).

{¶66} A trial court has broad discretion in determining the admissibility of evidence in accordance with rules and procedure. "A trial court is afforded broad discretion in determining the extent to which such evidence may be admitted under Evid.R. 609." *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 27, citing *State v. Wright*, 48 Ohio St.3d 5, 548 N.E.2d 923 (1990), syllabus.

{¶67} Potts was convicted in 2000 for kidnapping. He was released from prison on that offense in 2007 and on parole for 10 years, until 2017. (T. II/145-147). In his opening statement, Potts stated, "On an unrelated matter Todd Potts went to prison, and this is more than 20 plus years ago now. * * * And it was actually at this time, locked up

at the institution, that he met [M.E.]." (T. I/142). During his direct testimony, Potts testified that he was in prison when he met M.E. (T. II/107). In October 2007, Potts was reincarcerated for six months on a parole violation. (T. II/109).

{¶68} Pursuant to Evid.R. 609(B), we find the trial court did not abuse its discretion in admitting evidence of Potts' prior conviction for kidnapping because his post-release control ended less than 10 years ago.

{¶69} We further find no abuse of discretion to admit the evidence of Potts' prior convictions of kidnapping and gross sexual imposition under Evid.R. 609. As the trial court noted when it overruled Potts' objection, Potts did not suffer unfair prejudice because he had opened the door to inquiry into his prior convictions with his opening statement and direct testimony stating he was in prison when he met M.E. and he was on post-release control in 2007. Further, Potts testified on direct that that M.E. was the only person who had accused him of abuse. On cross examination, the State noted that Potts testified M.E. was the only person who ever accused him of abusing them. (T. II/145). Potts answered, "Correct. No one's ever said or accused me of abusing her other than through family and letters, like I mentioned earlier." (T. II/145). The State then asked Potts if he was in prison for a conviction of kidnapping. (T. II/145). The evidence of Potts' kidnapping and gross sexual imposition based on Potts' direct testimony had probative value and was not unfairly prejudicial.

{¶70} Potts' third Assignment of Error is overruled.

**IV.**

{¶71} In his fourth Assignment of Error, Potts contends the trial court erred when it permitted M.E. to read her statement to the jury on redirect examination. We conduct our analysis under the abuse of discretion standard of review for evidentiary rulings.

{¶72} On appeal, Potts raises multiple arguments as to why the trial court abused its discretion in permitting M.E. to read her statement. He first argues it was in violation of Evid.R. 612, which states:

> If a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

In this case, we agree with Potts that Evid.R. 612 could not be used to permit the use of M.E.'s written statement because the statement was not used to refresh her memory for the purpose of testifying. The trial court's ruling on Potts' objection, however, did not implicate Evid.R. 612.

{¶73} Potts then cites this Court to our decision in *State v. Clay*, 187 Ohio App.3d 633, 2010-Ohio-2720, 933 N.E.2d 296, wherein we held the State could move for the admission of the victim's prior written statement into evidence based on Evid.R. 803(5). Pursuant to Evid.R. 612, the State refreshed the victim's recollection with her prior written statement to the police after she stated she could not remember events and refused to answer the prosecutor's questions. *Id.* at ¶ 24. The victim's prior written statement was

marked as an exhibit and submitted to the jury. *Id.* at ¶ 8. On appeal, the appellant argued the trial court erred when it admitted into evidence the victim's prior written statement. *Id.* at ¶ 15. We determined the submission of the prior written statement as an exhibit was permissible under Evid.R. 803(5) because the victim in that case was an adverse witness. *Id.* at ¶ 38. In this case, we find the holding in *Clay* has no application to our analysis. M.E. read her statement to the jury, but the written statement was not admitted as an exhibit and submitted to the jury.

{¶74} Based on the arguments raised in Potts' appellate brief and his objection to the trial court, we find no abuse of discretion to permit M.E. to read her written statement into the record on redirect examination. The trial court ruled that based on Potts' cross examination, the contents of the statement were within the scope of redirect examination. Potts was then permitted to conduct a recross examination of M.E.

{¶75} Based upon the entire record before us, we conclude beyond any reasonable doubt that Potts was not prejudiced by any error in the admission of M.E.'s written statement and testimony and that the admission of that testimony, even if in error, had no impact on the verdict. *State v. Wilson*, 5th Dist. Stark No. 2016CA00071, 2016-Ohio-5895, 2016 WL 5118096, ¶ 51.

{¶76} Potts' fourth Assignment of Error is overruled.

**V.**

{¶77} In his fifth Assignment of Error, Potts argues his convictions for Felonious Assault, Domestic Violence and Aggravated Menacing were against the sufficiency and weight of the evidence. We disagree.

{¶78} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶79} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶80} Potts was convicted of Felonious Assault pursuant to R.C. 2903.11(A)(1), which states, "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." He was also convicted of Domestic Violence, which states, "[n]o person shall

knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). He was finally convicted of Aggravated Menacing in violation of R.C. 2903.21(A), which states, "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, * * *, or a member of the other person's immediate family."

{¶81} In his appellate brief, Potts argues the jury lost its way in convicting him based on inconsistencies in M.E.'s testimony related to the events on March 21, 2020. He first contends that M.E. testified that she urinated on herself during Potts' assault. She also testified that Potts permitted her to use the bathroom and Potts also used the bathroom. In her written statement, M.E. did not state she urinated on herself. Officer Klemp testified that she did not observe that M.E.'s pants were wet. Potts next argues there were inconsistencies in M.E.'s description of her injuries and the medical reports. He next contends the investigation of the alleged incident by the Lawrence Township Police Department cannot be used to support his conviction because the investigation did not produce any evidence of Potts' presence at M.E.'s home on March 21, 2020. Officer Klemp did not locate a receipt for the Dairy Queen food, she did not observe a broken kitchen chair, the kitchen where the assault allegedly occurred did not look out of order, and she did not take M.E.'s cell phone to document Potts' alleged phone calls and texts. He finally contends there was no evidence presented of a broken kitchen chair.

{¶82} M.E. and Potts both testified that they had communicated with each other on March 21, 2020. M.E. showed Officer Klemp her cell phone showing phone calls from Potts.

{¶83} Potts denied being at M.E.'s home on March 21, 2020. M.E. identified Potts as being in her home and committing the offenses against her on March 21, 2020. When A.K. came home, she saw M.E.'s injuries and that she was scared and upset. She testified that she saw the broken chair and described how it was broken in half, similar to M.E.'s testimony. She also found Potts' glasses in the kitchen, which she testified she later stomped on in anger. The State presented photographic evidence of M.E.'s injuries, which both Officer Klemp and the paramedic testified they observed.

{¶84} In this case, whether Potts committed felonious assault, domestic violence, and aggravated menacing on March 21, 2020 essentially came down to a credibility determination between M.E. and Potts. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The jury, as the trier of fact, was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. When assessing witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." *State v. Pizzulo*, 11th Dist. Trumbull No. 2009-T-0105, 2010-Ohio-2048, ¶ 11. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *Id.* "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the

evidence." *State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, 2017 WL 4176953, ¶ 47 quoting *State v. Johnson*, 5th Dist. Stark, 2015-Ohio-3113, 41 N.E.3d 104, ¶ 61, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The finder of fact need not believe all of a witnesses' testimony but may accept only portions of it as true. *Id.*

{¶85} The jury heard the inconsistencies between M.E.'s testimony, her written statement, and the observations by the other witnesses and found M.E.'s testimony to be more credible than Potts. The jury's not guilty findings as to Kidnapping and Abduction show  it considered the evidence and discerned the State demonstrated beyond a reasonable doubt that Potts committed the offenses of Felonious Assault, Domestic Violence, and Aggravated Menacing.

{¶86} Upon our review of the record, we conclude Potts' convictions are supported by the sufficiency of the evidence and not against the manifest weight of the evidence.

{¶87} Potts' fifth Assignment of Error is overruled.

**VI.**

{¶88} In his sixth Assignment of Error, Potts claims cumulative errors in his trial deprived him of a fair trial. We disagree.

{¶89} In *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), the Ohio Supreme Court held pursuant to the cumulative error doctrine "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."

{¶90} In the instant case, we do not find multiple instances of harmless error triggering the cumulative-error doctrine, and Potts' sixth Assignment of Error is therefore overruled.

## CONCLUSION

{¶91} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, John, P.J. and

Baldwin, J., concur.