[Cite as *State v. Berning*, 2026-Ohio-1799.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                             Court of Appeals No.  L-25-00200

    Appellee                                             Trial Court No.  CR0202500528

v.

Matthew Berning                                    **DECISION AND JUDGMENT**

    Appellant                                            Decided: May 15, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Garrett W. Dolly, Assistant Prosecuting Attorney, for appellee.

Tyler Naud Jechura, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Matthew Berning, appeals the August 12, 2025 judgment of the Lucas County Court of Common Pleas sentencing him to 18 months in prison and 180 days in the Corrections Center of Northwest Ohio, to be served concurrently, after a jury found him guilty of one count of strangulation in violation of R.C. 2903.18(B)(3) and (C)(3), a felony of the fourth degree; and one count of domestic violence, in violation of R.C. 2919.25(A) and (D)(2), a misdemeanor of the first degree.  The sole issue before

this court is whether the trial court abused its discretion in admitting the 911 call that led to Berning's arrest. For the following reasons, we affirm.

## I. Factual and Procedural Background

{¶ 2} On April 7, 2025, Toledo Police responded to an open-line 911 call from the residence that Matthew Berning shared with the victim in this case, his ex-girlfriend, C.R. In the call, a woman's voice could be heard yelling for "Matt" to "get off of me" and "stop," and repeatedly yelling that "he's choking me." When the officers arrived at the residence, they kicked the front door open and found Berning undressed from the waist down and on top of C.R. After the officers spoke with C.R., Berning was placed under arrest.

{¶ 3} On April 17, 2025, Berning was indicted on one count of strangulation and one count of domestic violence. He was arraigned days later and entered a plea of not guilty to both charges. The case was tried before a jury beginning July 21, 2025. The State presented the testimony of four witnesses—Lieutenant Philip Cook, C.R., Officer Jordan Freimark, and Detective Peter Siwa. The defense did not present any witnesses.

## A. Lieutenant Philip Cook's Testimony

{¶ 4} Lieutenant Cook was the State's first witness. He explained that he was assigned as the Toledo Police Department's ("TPD") communication all-hazard liaison and homeland security coordinator. Lieutenant Cook noted that part of this job included becoming the record custodian for recorded 911 calls. He described the recording and storage system, as well as his duties to process and retrieve requested calls. He further

2.

explained that both the 911 recordings and their corresponding incident detail reports are kept in the ordinary course of business for TPD.

{¶ 5} Turning to the 911 call at issue in this case, Lieutenant Cook testified that he was familiar with that call and had reviewed both the 911 call and its incident detail report. Lieutenant Cook confirmed that the 911 call was an "open-line" call and explained that in an "open-line" call, the caller does not respond, however, the 911 operator will still leave the line open and enter any information they hear into the database. Lieutenant Cook read several comments in the detail report that had been entered by the 911 operator—"[f]emale saying, get off of me Matt"; "[s]till open line. Female saying help, he's choking me"; "[s]aying, stop, you're hurting me"; "[f]emale screaming and yelling again, Matt, I have to pee. Listen to me. Please stop"; and "[f]emale screaming, stop."

{¶ 6} After confirming with Lieutenant Cook that the copy of the 911 call was a fair and accurate copy of the call received on April 7, 2025, the State moved to admit and publish the exhibit.

{¶ 7} Berning's attorney objected to the admission of the 911 call arguing that the "voices on the recording does (sic) not identify [C.R.] as the caller." The trial court permitted Berning's attorney to cross-examine Lieutenant Cook as to the authenticity of the 911 recording prior to its admission and publication to the jury. During cross-examination, Lieutenant Cook admitted that the caller "[d]oesn't appear to" identify herself. Following the cross-examination, the trial court admitted the recording over Berning's objection and the State played the call for the jury.

3.

{¶ 8} After the call was played, Lieutenant Cook testified that the name "Matt" was heard on the recording. Lieutenant Cook initially forgot the name of the woman's voice heard on the recording, however, after the State asked, "[i]f I said [C], did that sound correct to you," he confirmed that the victim's first name was the name heard in the call.

{¶ 9} When asked about the location of the call, Lieutenant Cook explained that there are three different technologies used to "geo locate" a phone during a 911 call. Based on those three methods, Lieutenant Cook explained that there was a 90 percent confidence rate that the call originated from the house shared by Berning and C.R. He then testified to the phone number used to call 911 on that night.

## B. C.R.'s Testimony

{¶ 10} The State's second witness was C.R. C.R. first explained the background of her relationship with Berning—that they had started dating about seven years earlier, that he had moved into her home shortly after they began dating, and that they had ended their romantic relationship about two years before the incident.

{¶ 11} Turning to the events of April 7, 2025, C.R. explained that she was watching news in her bedroom trying to sleep, when an intoxicated Berning came in her room. She stated that she repeatedly told him to get out and leave her alone, but Berning got on top of her, held her wrists above her head, and put all his weight on her chest. C.R. explained that at one point, Berning put a pillow over her face, and also placed both hands around her neck. C.R. told the court that she screamed for help while Berning was on top of her, but she could not breathe and thought she was going to die.

4.

{¶ 12} When asked how she was able to call 911, C.R. testified that while this attack was happening, she was trying to "scoot any way I could to get air" and was able to reach for her cell phone, which was in her bed. C.R. explained that she dialed 911 and then slid the phone so Berning would not see it. During her testimony, C.R. also confirmed her phone number (which matched the number that Lieutenant Cook testified had called 911).

{¶ 13} C.R. told the court that the attack stopped when police kicked the door to her home open and "got him off of [her]."

{¶ 14} On cross-examination, C.R. admitted that she forgot to tell the police about Berning pressing a pillow against her because she did not remember it in the moments after the attack. When asked if she remembered calling 911, C.R. engaged in the following exchange with Berning's attorney regarding the call:

Q:    Okay. You remember calling 911, you testified?

A.    Yes.

Q:    Would it be fair to say that you told Matt to stop at least 20 times on the 911 call?

A:    Yes.

Q:    And would it be fair to say that multiple times you told him to get off of you?

A:    Yes.

Q:    And you indicated, I'm going to use your words at the night, Matt, I have to pee?

A:    Yes.

Q:    Okay. And you had enough breath to say all this stuff--

A:    Yes.

Q:      -- on the 911 call?  So at the time you had a breath?

A:      Yes.

## C.  Officer Jordan Freimark's Testimony

{¶ 15} Officer Freimark from TPD was the State's third witness.  He testified that on April 7, 2025, he responded to a 911 call with his partner.  When they arrived at the house, they heard loud music coming from inside the home.  Officer Freimark explained that he approached the front door and knocked while his partner went to the side of the house.  According to Officer Freimark, his partner informed him that he could hear a woman screaming from inside the house and at that point, their lieutenant gave him permission to force entry into the home.

{¶ 16} Officer Freimark testified that when he entered the residence, he looked across the living room into the back bedroom and observed a man (later identified as Berning) on top of a woman (later identified as C.R.) on the bed.  He explained that Berning approached the officers and they took him into custody.  Once Berning was in custody, Officer Freimark turned his attention to C.R. and began speaking with her. Officer Freimark described C.R.'s demeanor during this conversation as "hysterical, shaking, she was trying to catch her breath."  He stated that he noticed several injuries on C.R.'s neck, collarbone and chest that were, based on his experience, consistent with someone who was strangled or choked.  Officer Freimark further noted that while still in an excited state from the incident, C.R. told him that she was choked around the neck; that when she tried to scream, Berning covered her mouth and it made it hard for her to breathe; and that he pressed his knee into her chest/stomach area.  Officer Freimark

6.

finished his testimony noting that once he booked the evidence from the night, that concluded his involvement with the case.

{¶ 17} On cross-examination, Officer Freimark admitted that he did not witness Berning choking C.R., nor did he observe Berning with his hand over C.R.'s mouth. He additionally noted that he did not really interact with Berning on the night of the incident.

{¶ 18} Officer Freimark's testimony was corroborated by his body-worn camera footage, which was admitted into evidence and produced for the jury.

### D. Detective Peter Siwa's Testimony

{¶ 19} The State's final witness was the lead investigator assigned to this case, Detective Peter Siwa from TPD. Detective Siwa testified that on April 7, 2025, he responded to a call regarding the incident, and arrived at the scene after the other officers had completed their initial investigation and Berning had been placed in a patrol car. Detective Siwa admitted that he did not interview Berning at the time of his arrest because he believed there could be a potential sex crime investigation, and he was concerned that an interview at the scene could impact a later interview with the sex crimes unit. He did, however, speak with C.R. on scene and noted that by the time he spoke with her, she was calmer. Detective Siwa testified that he observed signs of strangulation on C.R. From his investigation, Detective Siwa made the decision to charge Berning with strangulation and domestic violence.

{¶ 20} The State rested. Berning moved for acquittal pursuant to Ohio Crim.R. 29(A), which the court denied. The defense rested without presenting any witnesses and closing arguments were made by both sides.

7.

## E. Verdict and Sentencing

**{¶ 21}** After hearing the evidence, the jury found Berning guilty of one count of strangulation in violation of R.C. 2903.18(B)(3) and (C)(3), a felony of the fourth degree; and one count of domestic violence, in violation of R.C. 2919.25(A) and (D)(2), a misdemeanor of the first degree.

**{¶ 22}** On August 11, 2025, the court proceeded to sentencing and sentenced Berning to 180 days in the Corrections Center of Northwest Ohio for the domestic violence charge and 18 months in prison for the strangulation charge. The court ordered the sentences to be served concurrently for a total sentence of 18 months, and granted Berning credit for 127 days of time served.

**{¶ 23}** Berning appealed and assigned the following error for our review:

I.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED A 911 CALL WHEN THE IDENTITY OF THE CALLER WAS UNKNOWN

## II. Law and Analysis

**{¶ 24}** "A trial court has broad discretion in the admission and exclusion of evidence. Unless the trial court has clearly abused its discretion, an appellate court should not interfere in its determination." *State v. Apanovitch,* 33 Ohio St.3d 19, 25 (1987), citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

**{¶ 25}** In his sole assignment of error, Berning challenges the admission of the 911 call on the grounds of authentication and the lack of identification of the caller.

8.

Specifically, Berning notes that the woman in the 911 call never identifies herself. Based on this lack of identification, Berning argues that that the call was never properly authenticated and therefore improperly admitted into evidence. He believes that the only appropriate remedy is to vacate his convictions.

{¶ 26} Evidentiary Rule 901 governs the authentication of evidence. It states, in relevant part:

**(A) General provision.**

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(B) Illustrations.**

By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\* \* \*

(5) *Voice identification*.

Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

{¶ 27} Notably, "the 'sufficient to support a finding standard' of Evid.R. 901 is not rigorous, and the threshold of admissibility articulated in it is low." *State v. Steele*, 2005-Ohio-943, at ¶ 115 (12th Dist.), quoting *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist. 1991). "This standard is less demanding than preponderance of the evidence." *State v. Potts*, 2023-Ohio-954, ¶ 59 (5th Dist.), citing *State v. Nigro*, 2022-Ohio-2864, ¶ 35 (5th Dist.). "The proponent must demonstrate only a 'reasonable likelihood' that the evidence is authentic, which may be supplied by the testimony of a witness with knowledge." *Id*.,

9.

citing *Nigro* at ¶ 35. This court has found that the identification of the voice on a recording is necessary to meet the authentication requirements for admissibility of the recordings under Evid.R. 901. *Toledo v. Green*, 2015-Ohio-1864, ¶ 37 (6th Dist.), citing *State v. Spires*, 2005-Ohio-4471, ¶ 27 (7th Dist.).

{¶ 28} In this case, while the caller did not identify herself and none of the witnesses identified the voice of the caller, the trial court did not err when it admitted the 911 call.

{¶ 29} First, Lieutenant Cook confirmed that the 911 recording was a true and accurate copy of the call. He testified to the accuracy of the location of the 911 call, which matched the residence shared by Berning and C.R. Additionally, he testified to the phone number that the call came from, which matched the phone number C.R. gave during her testimony. Lieutenant Cook also testified that the woman's voice in the 911 call yelled for "Matt" to "stop" and that he was choking her. This matches Berning's first name and the injuries reported in Officer Freimark's testimony. Lieutenant Cook also identified that the man in the call stated the first name of the victim, C.R.—though he did need his memory refreshed to recall her first name.

{¶ 30} Moreover, C.R. testified that she had made a 911 call on her cell phone before hiding the phone from Berning. On cross-examination, C.R. repeatedly referenced her 911 call—that she told "Matt" to stop "at least 20 times on the 911 call" and that she told him to get of her. Furthermore, Berning's attorney directly acknowledged that C.R. made the 911 call during his questioning on cross-examination—"And you indicated [in

10.

the 911 call], I'm going to use *your words at the night*, Matt I have to pee?" (Emphasis added.); and "you had enough breath to say all this stuff… on the 911 call?"

{¶ 31} Finally, there are significant overlaps in the recording of the 911 call and Officer Jordan Freimark's unchallenged body worn camera footage presented to the jury. At approximately 33 seconds into the police footage, Berning is seen and heard stating, "what the fuck? You just kicked our fucking door in--" before another voice is heard stating, "let me see your hands."  After that, Berning is seen and heard stating, "you just kicked our door in--" and after some back and forth, can be heard stating, "you just kicked our door in.  What the fuck is wrong with you?"  There is an approximately 48-second jump in the recording, and then a woman's voice is heard saying "you almost killed me dude," while a dog barks in the background.

{¶ 32} Turning to the 911 call, at approximately five minutes and fifty-one seconds, a man's voice is heard stating, "what the fuck? You just kicked our fucking door in--" before another voice can be heard stating "[inaudible] your hands."  After that, the original man's voice is heard stating, "you just kicked our door in--" and after some inaudible back and forth, that same voice is heard stating, "you just kicked our door in. What the fuck is wrong with you?"  At approximately six minutes and forty-five seconds into the recording, a dog barks in the background while a woman's voice can be heard saying "you almost killed me dude."

{¶ 33} Between the testimony and the similarities in the recordings, it was reasonable for the trial court to conclude that C.R. was the 911 caller.  Therefore, the

11.

court did not abuse its discretion in admitting the recording.  Accordingly, we find Berning's sole assignment of error not well-taken.

### III.  Conclusion

{¶ 34} Based on the foregoing analysis, we affirm the August 12, 2025 judgment of the Lucas County Court of Common Pleas.  Berning is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.